**GAMBLE–SKOGMO, Inc., et al.**

v.

**FEDERAL TRADE COMMISSION.**

No. 14657.

United States Court of Appeals
Eighth Circuit.

Feb. 25, 1954.

108

W. P. Berghuis, Minneapolis, Minn., for petitioners.

J. B. Truly, Attorney, Federal Trade Commission, Washington, D. C. (W. T. Kelley, General Counsel, and Robert B. Dawkins, Asst. General Counsel, Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The Federal Trade Commission, in proceedings under 15 U.S.C.A. §§ 21 and 45(b), found that Gamble-Skogmo, Inc., its officers and its directors had been violating section 3 of the Clayton Act, 15 U.S.C.A. § 14,[1] and section 5(a) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a),[2] and entered cease and

---

1. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 38 Stat. 731, 15 U.S.C.A. § 14.

2. "(1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

\* \* \* \* \*

"(6) The Commission is empowered and directed to prevent persons, partnerships, or corporations \* \* \* from

desist orders conforming to its findings. The corporation, its officers and its directors have petitioned for review of these orders.

The first count in the Commission's complaint had charged in substance that the corporation, under the direction of its officers and its directors,[3] in its business as a wholesale distributor, was engaged in making sales and contracts for the sale, in interstate commerce, of goods, wares and merchandise, consisting of automobile supplies, electrical appliances, sporting goods, paints, ready-to-wear clothing, and the various other items distributed by it,[4] to its numerous retail dealers,[5] upon the condition, agreement and understanding that such dealers should not purchase merchandise from any other distributor, and with this having the effect, in the line of commerce in which the corporation was engaged, that competition might be and had been substantially lessened[6] and that a monopoly was being tended to be created.

The second count of the complaint charged in substance that the imposing of such a condition, agreement and understanding by the corporation upon its dealers, for exclusive requirements purchasing by them, constituted an unfair trade practice and method of competition in commerce, as did also the attempts of the corporation to police and enforce such condition, agreement and understanding, by the holding of dealers' meetings at which the company's policy of requiring exclusive handling of its goods was emphasized and the possibility of reprisal declared; by the sending out of fieldmen to check dealers' stocks for outside merchandise, to report to the corporation the amount of such merchandise carried, to advise any such dealers to get rid of their outside merchandise, and to threaten them with a cancellation of their contracts and the inability thereafter to obtain further goods from the corporation; by the paying of a bonus to dealers whose cooperation with the corporation in exclusive requirements purchasing was deemed by it to be satisfactory and the reducing or denying of such a bonus to dealers who were purchasing outside goods; and by engaging in making cancellation of various dealers' contracts for the sole reason that they were carrying merchandise of other distributors.

The corporation denied all of the Commission's charges against it. It contended that it had not contracted to sell or made sales to its dealers upon the condition, agreement or understanding that the dealer was required to purchase exclusively from the corporation and could not handle other distributors' goods; that it equally had no such policy as a matter of practice in the incidental or collateral relationships which it had with its dealer stores; that, while it endeavored to sell its dealers all of their merchandise needs, this was done on the basis of showing them the possibilities and advantages of its goods as a store line and without any threats or other coercion against them, either express or implied; that the purpose of the dealers' meetings which it held was to stimulate interest and activity among

using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 38 Stat. 719, 52 Stat. 111, 15 U.S.C.A. § 45(a).

3. In the opinion hereafter, our reference to the corporation will imply also its officers and directors, for purposes of their amenability to the Commission's orders.

4. The corporation had been selling some 12,000 different articles or items but had subsequently reduced its line to a total of approximately 7300 articles or items of merchandise.

5. These dealers amounted to some 1700 in number, located in 25 midwestern and western states, mostly in towns or cities having a population of 5,000 or less. The stores were owned and operated by the dealers but carried signs identifying the owner as an "Authorized Gamble Store Dealer." Only one such authorized-dealer store was allowed to exist in each locality.

6. The amount of the corporation's sales to its dealers in the year preceding the filing of the complaint was $61,071,225, or an average of $35,200 per store.

them, and further ties on their part to the corporation and its officers by the opportunity afforded for personal contact and acquaintanceship, but at none of these meetings had the corporation or its officers assumed to declare or intimate that the dealers would have to handle Gamble merchandise exclusively or else they would be subject to reprisal; that the fieldmen which the corporation sent out did not have any authority to make agreements or contracts with a dealer, or to impose any condition upon or exact any promise from him, or to make any threat against him because of his handling of outside goods, and if any such acts ever had been done by a fieldman it was without authority, sanction or knowledge on the part of the corporation; that the bonus payments which the corporation for a time had made to dealers in appreciation of and reward for their cooperativeness in purchasing its goods were not an unfair trade practice, in that they were in nowise coercive, nor did they affect competition, either as between the individual dealers, all of whom were located in separate towns, or in relation to the public generally, whose purchase price from a dealer was in no way related to whether the dealer was or was not a recipient of the small bonuses paid ($\frac{3}{4}\%$ to 1% of the amount of goods purchased by such dealer during the year) and, in any event, the making of any such bonus payments had been terminated by the corporation more than a year and a half prior to the present proceedings; and, finally, that the corporation had not made cancellations of dealers' contracts because of the purchasing of outside merchandise but had only made cancellations (comparatively few in actual number) in situations where a dealer was failing relatively to do such a fair share or volume of business in the corporation's products, as the community afforded a reasonable opportunity for obtaining, and as the corporation legitimately and competitively had a right to expect, or where the dealer was one who demanded special favors or consid-

erations in obtaining merchandise or was of the type with whom smooth relations were not capable of being generally maintained, so that the corporation did not care to do business with him or to have him held out to the general public as an authorized Gamble store dealer.

The first attack which here is made upon the Commission's orders is that the Commission failed to accord to the corporation the processes of hearing and determination to which it legally was entitled in the existing situation. The contention rests upon the facts that the trial examiner, before whom all of the testimony in the case had been taken, and who had had the matter duly submitted to him on briefs and oral argument, was thereafter, because of his having reached the age of 70 years and being eligible for an annuity and having thus become subject to being automatically retired under the provisions of 5 U.S.C.A. § 715 of the Civil Service Retirement Act, treated by the Commission as being legally unavailable for further official duty in the proceeding; that the Commission thereupon made designation of a substitute trial examiner (a man 76 years of age, but who did not yet have the number of years of service required to entitle him to a retirement annuity) for the purpose of having him prepare a recommended decision in the case and make findings and conclusions on the basis of the evidence taken by the initial trial examiner; that the Commission denied a motion on the part of the corporation to disqualify the substitute trial examiner and to continue the employment and status of the initial trial examiner to the extent of permitting him to make his findings, conclusions and recommended decision in the situation, which, it was asserted, he was willing and able to do; that the Commission also denied an alternative motion by the corporation to strike the evidence and record in the case and to require the substitute trial examiner to engage in a de novo hearing, in order that he thus would have

the opportunity to see and hear the numerous opposing witnesses involved and be able to evaluate their credibility upon this basis, in his resolution of the many material and disputed questions of fact which it was necessary for him to determine; and that the substitute trial examiner was permitted to make findings and conclusions and prepare a recommended decision (which the Commission substantially followed) upon a cold-print reading of the record made before the initial trial examiner, a choosing in controlling measure between the testimony of the conflicting witnesses from such a reading, and a crediting of one as against another, without having seen or heard any of them testify.

The corporation argues that we should go the length of holding that the Commission's action, in refusing to exercise its powers to continue the employment and status of the initial trial examiner until he had prepared a recommended decision, amounted in the situation to legal arbitrariness and to a violation of due process.

Under 5 U.S.C.A. § 715(a) and (b), the initial trial examiner, having reached the age of 70 years, having completed 15 years of service, and having been given 60 days notice of the date prescribed by law for his retirement, was "automatically separated" by the statute itself from his service and position with the Commission and was not "eligible again to appointment to any appointive office, position, or employment under the government * * * unless the appointing authority determines that he is possessed of special qualifications".

Although the initial trial examiner thus, as a matter of law, had been separated from his service, position and status with the Commission, he was immediately reemployed by it in his previous capacity for two brief and successive intervals of one month and of 15 days respectively. The Commission thereafter, however, took no further steps with respect to him, and the short, fixed period for which he was reem-

ployed accordingly ran out, and his connection with the Commission ceased. It appears from the record that he thereupon was taken on as a trial examiner by another government agency. From the time that the present case had been orally argued and submitted to him, before his automatic separation under the statute, and until the expiration of the reemployment made of him by the Commission, there had elapsed a period of four months, during which he had not submitted any findings, conclusions or recommended decision in the situation.

Why the Commission did not act to determine whether the separated examiner possessed the qualifications necessary for any further reemployment of him, or to renew his reemployment for a sufficient period to enable findings, conclusions and a recommended decision to be made by him, if he might have been found to be possessed of special qualifications, is not a matter which the statute affords any right or any basis for us to consider. The provision of 5 U.S.C.A. § 715(a) and (b), subjecting the initial trial examiner to automatic separation and making him ineligible for further service "unless the appointing authority determines that he is possessed of special qualifications", cannot legally be said, on its language or purpose, to have imposed any duty or obligation whatsoever upon the Commission to take action to determine the retired employee's qualifications or to at all reemploy him.

The statute would seem on its very face to be intended simply to afford a government agency the privilege of doing these things in respect to some retired employee, as a means of facilitating its own functioning, where this appeared to it to be desirable and proper in some situation. But each appointing authority—one no less than another—has been left with the absolute right on its part, to not engage in any such determination as to any retired employee, to not find that any such person is possessed of special qualifications, and, even if such qualifications might have been determined to exist, to not reemploy any

such person, all as a matter of its own discretion, judgment and policy. And since an agency thus has the absolute right to not do any of these things, its not-doing of any or all of them is without any basis for legally constituting or being examined as administrative arbitrariness.

Nor is it possible to transmute the Commission's not-taking of these steps into a question of due process, because of its effect in the present situation to deprive the corporation of having findings, conclusions and a recommended decision made by the separated trial examiner as the hearing officer. A change in personnel occurring during the course of or at the close of an administrative hearing does not as such give rise to constitutional repugnance in a decision or order made by the administrative tribunal on the basis of the previous hearing. Twin City Milk Producers Ass'n v. McNutt, 8 Cir., 122 F.2d 564, 569. See also N. L. R. B. v. Stocker Mfg. Co., 3 Cir., 185 F.2d 451, 453.

And further, the automatic separation for which the retirement statute provides, the ineligibility and lack of status which it makes exist thereafter (unless the appointing authority chooses to pass upon the retired employee's capacity, determines that he is possessed of special qualifications, and elects to give him reemployment), and the absence here of both eligibility and status which had come thus to be reestablished and were existing, necessarily resulted in the retired examiner having legally "become unavailable" to the Commission for the making of a recommended decision, within the procedural requirement of section 5(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1004(c), that "The same officers who preside at the reception of evidence * * * shall make the recommended decision or initial decision * * * except where such officers become unavailable to the agency."

This provision of the Administrative Procedure Act can hardly soundly be read as not accepting lack of capacity, either legal or physical, as constituting unavailability on its face, but as being intended to require an agency to first attempt to do whatever it can to get any existing incapacity remedied and removed, before it is entitled to regard a hearing officer as having become unavailable to it. We do not think that anyone would contend that there is an implied duty upon an agency to attempt to get a physically disabled hearing officer restored to health, before there is any right under the Administrative Procedure Act to regard him as having become unavailable to it. No more, in our opinion, as to lack of legal capacity, is there any basis to argue that an agency has an implied duty to attempt to get a statutorily retired hearing officer restored to eligibility and position, and that only where this has been attempted and has not been possible will unavailability have come to exist.

It may be repeated that the only basis that at all exists for any restoration of eligibility and status as to a retired employee is the provision of 5 U.S.C.A. § 715(b), of the Civil Service Retirement Act, and that this provision clearly does not impose any duty in this regard upon an administrative agency but leaves the agency with the absolute right to not take any steps to determine whether a retired employee is possessed of special qualifications or to not reemploy him. In this condition of unrelated legislative field and distinct self-purposed policy, as between the Civil Service Retirement Act and the Administrative Procedure Act, it would not constitute sound natural or canonical construction to view the Administrative Procedure Act as having unindicatingly been intended to invade or impinge in any way upon the provisions of the Civil Service Retirement Act.[7] Hence, the term "unavailable" in section 5(c)

7. "A long settled public policy is not to be overridden by the general terms of a statute which does not show with certainty a legislative intent to depart from that policy." National Manufacturing Co. v. United States, 8 Cir., 210 F.2d 263, 274.

of the Administrative Procedure Act must judicially be read, as the prerogative of the Civil Service Retirement Act is entitled to have respectingly done, in necessary harmony with and acceptance of the status of unavailability which the latter Act automatically creates and which it has not intended that anyone should have an obligation to change.

The holding of unavailability which we have just made is, however, argued by the Commission to be required to be given the specific significance under the Administrative Procedure Act of ending all basis for any attack whatsoever upon the legal propriety of a substitute examiner in such a situation preparing and submitting a recommended decision on the proceedings had and the record made before the initial examiner. The Commission says that this logically must be what section 5(c) of the Administrative Procedure Act was intended to do. It thus reads the provision, that "The same officers who preside at the reception of evidence * * * shall make the recommended decision or initial decision * * * except where such officers become unavailable to the agency", as having for its direct purpose the authorizing of administrative agencies to deal with every such situation in just this absolute manner.[8]

But this would seem to be an inverted approach to the remedial emphasis and object of the provision. Reading the provision from head instead of foot, as well as in relationship to the rest of section 5(c), we think it must be recognized that the primary concern of the provision was to prescribe a procedural guaranty, in the class of administrative proceedings which it covered, that recommended or initial decisions, which were to be submitted by a trial examiner to an administrative tribunal for its consideration or guidance, would in general be made by the examiner who had conducted the hearing and received the evidence, and not by some other examiner.

The object and the consequence of this guaranty would inherently be to make direct credibility evaluation by a trial examiner constitute a processive element or factor in the arriving at of intermediate administrative findings, conclusions and decisions, submitted to an agency, in the functioning of the examiner system. The opportunity to make that evaluation on a direct basis, and the contribution to the soundness of a result from this having been done (even though the evaluation might be one of instinctive rather than conscious rationalization), have generally been regarded, in the processive aspect of attaining justice, as inherently tending to more probable fairness and readier acceptance of judicial or quasi-judicial decision.

In legal concept, appearance and demeanor on the part of orally-testifying witnesses and permeating trial atmosphere to which these incidents may give rise are, in such situations, "assumed to be in evidence." Wigmore on Evidence, 3rd ed., § 946. And such an evaluation of credibility, therefore, in relation to oral conflicting testimony, on material matters, necessarily is of the nature and stature of any rationalized conclusion constituting a part of a judicial or quasi-judicial result. Cf. 58 Am. Jur., Witnesses, § 864, p. 493.

At the same time, of course, the affording of the opportunity for such credibility evaluation and the according of the benefit to parties of this being done are fundamentally procedural grants and prescriptions and, as previously indicated, not substantive due-process requisites.[9] It is entirely natu-

8. It was indicated before us, and not challenged, that in some other cases of similar situation, where the substitute examiner had undertaken to vacate the previous submission and to grant the parties a de novo hearing, the Commission had refused to allow him to so proceed and had required him to make a recommended decision on the record made before the initial examiner.

9. Even the constitutional right of an accused under the Sixth Amendment, to confrontation in a criminal case is not in

ral therefore that, just as in the case of other procedural grants or prescriptions, nonjurisdictional in nature, the need to allow some margin of flexibility or deviation practicably would be recognized either expressly or by sound implication. But no implied exception, and equally no expressed exception, unless its language so compels, should ordinarily be read in conflicting concept to, unnecessary curtailment of, or indulging escape from, the purpose which the procedural grant or prescription was designed to serve.

Here, Congress apparently felt the need to directly establish the general practice and policy in the examiner system of having recommended or initial administrative decisions made by the trial examiner who had received the evidence, and not made by some other examiner, as a means of insuring proper credibility evaluation. This legislative object and a reading of the exception in the light thereof do not seem to us to leave a rational basis to declare that such excusing of adherence to the statute as was allowed in situations of examiner unavailability was meant to permit of a procedural double-standard of credibility evaluation in the trial-examiner system. We do not believe that Congress fairly can be charged with having intended to grant the general procedural benefit of direct credibility evaluation on a wholly arbitrary basis—giving it with absoluteness to such parties as would not, and denying it with absoluteness to such parties as would, fortuitously become subject to a situation of examiner unavailability.

 It is to be remembered that what Congress motivatingly was concerned about, in the enactment of the Administrative Procedure Act, was the widespread demand which had arisen, on the part of the legal profession and the public, for the prescribing of procedural safeguards against the artificiality and

arbitrariness with which administrative processes and results were getting to be stamped. See Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L. Ed. 616. Accommodations and adjustments necessarily were permitted to creep into the statute, to avoid undue burden upon or unnecessary hampering of administrative function. But in giving effect to such compromises, generalities and ambiguities as thus found their way into the Act, it is the remedial purposes of the Act which must be accepted as its beacon light and allowed to glow upon its provisions, to the end that the Act may serve, as fully as its language soundly warrants, to correct those weaknesses, evils and abuses in administrative process and result, which had brought the Act about. Cf. Wong, supra, 339 U.S. at page 41, 70 S.Ct. at page 450.

And so it seems to us that such excusing of adherence to the prescription here involved as has been practicably permitted in situations of examiner unavailability should be regarded as intended, not to arbitrarily exclude any person on fortuitous circumstance from the benefit of a proper credibility evaluation, where that process is capable of affecting the examiner's result, but rather to merely waive the universality or absoluteness of the prescription (which is of course one of required observance, as to recommended or initial decisions, upon demand, in every case of existing examiner availability, regardless of whether credibility evaluation is or is not materially involved in the particular situation) to the extent of permitting nonobservance in case of examiner unavailability, only where credibility evaluation as such can be said to not be necessary or capable of constituting a material factor in the reaching of a recommended or initial decision. Administrative convenience and dispatch are of but little value, unless they also are reasonably capable of producing fairness of result.

its fundamental nature and purpose one of assuring direct credibility evaluation by a court or jury, although it necessarily

operates to produce that advantage as an incidental result.

In this connection, it is to be noted that the legislative history of the Act makes clear that Congress regarded credibility evaluation by a trial examiner as being a matter not merely of procedural safeguard to parties but also of functional contribution to administrative agencies in the reaching of their final decisions. Thus, the Report of the Committee on the Judiciary of the House of Representatives made the following comment, in relation to the power of an administrative agency under section 8(a) of the Act to make decisions: "The provision [§ 8(a)] * * * does not mean that initial examiner's decisions or recommended decisions are without effect. They * * * are of consequence, for example, to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing." See Senate Doc. 248, 79 Cong., 2d Sess., p. 272. A similar comment is contained also in the Report of the Committee on the Judiciary of the Senate. Id., p. 210.

On all these considerations, we are of the opinion that, under section 5(c) of the Administrative Procedure Act, the Commission had a right here to refuse to strike the evidence and the record and to not require the substitute examiner to engage in a de novo receiving of evidence, either in whole or in part, only if it fairly could be said that a credibility evaluation from hearing and seeing the witnesses testify was unnecessary, in the sense that a direct choice in personal credibility as between them would not have to be made or would not from the nature of the situation be capable of being of material assistance, in the attempt of the substitute examiner to arrive at the controlling facts.

Insofar as N.L.R.B. v. Dixie Shirt Co., Inc., 4 Cir., 176 F.2d 969, and N.L.R.B. v. Stocker Mfg. Co., 3 Cir., 185 F.2d 451, cited by the Commission, may be thought to reflect a different view, we are not able to agree with them. It will be observed that in the Dixie case the facts, as stated in the opinion, 176 F.2d at page 970, were that, before a substitute examiner was appointed, "the Chief Trial Examiner informed the parties that if it was desired, a new hearing would be granted before another trial examiner, but that if no such new hearing was requested, a new trial examiner would be appointed to prepare an intermediate report upon the record already made", and that "Neither party requested a new hearing." And in the Stocker case, the opinion does not show whether the respondent had acted to request a new hearing before the intermediate report of the substitute examiner was filed, while, also, the discussion made of the question under section 5(c) of the Administrative Procedure Act, 185 F.2d at page 453, consists of a single sentence.

There remains then the question of whether a credibility evaluation can be said in the present situation to constitute a salient element in a sound arriving-at of the controlling facts by an examiner. If, in arriving at some material fact or facts, either as a matter of direct determination or predicated inference, it is necessary to choose, or a choice is undertaken to be made, on a personal basis, between things, which some witnesses assert and other witnesses deny, neither of which is inherently incredible, and such a choice is acceptingly or rejectingly capable of affecting the result, proper credibility evaluation is inescapably involved as a salient processive factor.

Here, the recommended decision of the substitute examiner shows that he arrived at his determination of the facts in controlling measure by his believing of the various Gamble dealers and ex-dealers personally, who testified for the Commission, and by his disbelief of the corporation's officers in their opposing testimony, and further that on the basis of this belief and disbelief of the witnesses from reading their testimony, he also made the construction of an ambiguous provision in the corporation's contracts that the contracts them-

selves had obligated dealers to purchase from and deal exclusively in the corporation's merchandise and so were violative of section 3 of the Clayton Act.

Thus, the examiner stated in his recommended decision: "There is testimony in the record * * * to the effect that the contracts did not require the dealers to deal in the respondent company's merchandise exclusively; that more than 50 per cent of the dealers purchased some merchandise from other sources; that the field men or zone representatives were not salesmen and had no authority to make or cancel a contract nor to threaten a dealer with cancellation of a contract nor to demand that merchandise purchased by dealers from other sources be disposed of; that contracts were cancelled for a variety of reasons but none for the reason the dealer was buying other merchandise and that the respondent company had no policy of cancelling dealer contracts for that reason alone; *all of this testimony has been disregarded as in direct conflict with clear, direct and convincing evidence to the contrary and upon which the Examiner's findings * * * are based.*" (Emphasis added.)

And as to the contracts with dealers, as previously indicated, the examiner read the following provision and resolved its ambiguity on the basis of thus rejecting the officers' testimony: "To enable the Wholesaler to determine the quantity of stock to be carried on hand from time to time for filling orders of the Retailer, it is agreed that unless otherwise authorized in writing, the Retailer shall order, and obtain his merchandise from the Wholesaler's store or Warehouse at * * *." The officers of the corporation had testified that this provision was simply one to facilitate the sound operation of its various warehouses; that, as its introductory phrase implied, it was meant simply to require a dealer to order such goods as he purchased from Gamble only from the particular warehouse designated in his contract and to prevent him from attempting to order goods from any of the other warehouses in its system; and that the provision had never been construed or given application by the corporation as requiring a dealer to order all of his goods exclusively from Gamble. The examiner held that the provision was intended, construed and applied by the corporation against its dealers as an exclusive requirements-purchase clause and not as a facilitating warehouse-operation clause.

More concrete examples of obvious, personal credibility-evaluation made by the examiner on the record appear in the recommended decision. Thus, cancellations of the contracts of some of the ex-dealers testifying for the Commission were attempted to be specifically explained by the officers of the corporation. One ex-dealer, a man named Hagen, who seems particularly to have been trying to stir up the situation against the corporation, before the present proceeding was instituted, had testified that "I was cancelled for buying outside merchandise," although he admitted on cross-examination that, during all of the ten years that he was a Gamble dealer, he had been purchasing outside merchandise in an amount ranging from one-tenth to one-third of his business volume; that during all of this period no one had ever attempted to cancel his contract; that about the time that his contract was cancelled he had made it a point to visit other Gamble dealers—approximately "two-dozen" in number—and found that all of them were carrying outside goods; that it was not until after he had indicated a personal grievance against the corporation and had gone around to other dealers and urged them to quit buying from Gamble that his contract was cancelled; and that he had previously admitted to others that "My contract was not cancelled because of outside purchases but because of (my) subversive activities." The officers of the corporation testified that it had been these subversive attempts which Hagen had made to interfere with the corporation's relations with its other dealers and to injure its business that

had prompted the cancellation of his contract.

Explanations were also made of other situations of cancellations, which, on their face, if the officers were believed, equally would have constituted a legitimate basis for the corporation's actions. The examiner did not purport to hold, nor could he have done so on the record, that contracts of dealers were always cancelled where outside purchases of merchandise were being made, but his recommended decision does impress that he did not any more credit the officers' explanations of the various contract cancellations, either generally or specifically, than he accepted their testimony in other respects.

A further example of the examiner's direct discrediting of the officers' testimony as against that of other witnesses is found in his statement that, in substantially all of its dealers' meetings, the corporation had had some one "who addressed the dealers and who advised them, either expressly or inferentially, that they were required to purchase all of their merchandise from respondent company"—"at some of which (meetings) its President was present." An ex-dealer, named Nelson, testified that the president of the corporation had personally declared at some of the dealer meetings attended by the witness that "outside merchandise had to be dropped." The president testified that he and other officials of the corporation of course attended and talked at the various dealer meetings which were held, but that in none of these meetings had he ever said, nor had he ever heard any other official state, that the dealers had to buy all of their merchandise from Gamble, or anything to that effect. The other officials of the corporation gave similar testimony.

The extent to which the substitute examiner's appraisal of the lack of credibility of the corporation's witnesses went is also shown in the following excerpt from one of the footnotes of his recommended decision: "The head of the Dealer Department of the respondent company testified that the field reports which formed the basis for the action taken, in all cases where the contracts were cancelled were then destroyed, only a copy of the letter of cancellation being kept, and those relating to continuing contracts were destroyed annually, but there is convincing [circumstantial] evidence that field reports in cases where contracts were cancelled were not destroyed when the contracts were cancelled but were destroyed by the officers of the respondent company after investigation commenced and after their production had been requested by the Commission's attorney conducting the investigation."

Enough has been said, we think, to demonstrate that credibility evaluation on a personal basis had here constituted a salient factor in the recommended decision made by the substitute examiner. In this situation, as we have indicated, the general prescription of section 5(c) of the Administrative Procedure Act seems to us controlling, that the recommended decision should be made by the examiner who had presided at the reception of the evidence, in order that such a material credibility evaluation as was engaged in by the substitute examiner would include the elements of having seen and having heard the conflicting witnesses testify.

The Commission argues, however, that it was possible for the examiner to have ignored the conflict in testimony which has been alluded to and to have arrived at his decision on other elements of evidence, not involving the question of immediate, personal credibility-determination, such as letters, failure to call fieldmen named, to challenge specifically the testimony of dealers as to the fieldmen's statements and actions, etc. But we are here concerned only with what the examiner did and its legal propriety—not with whether it was or was not possible for him to have done something else. It is clear from a reading of the recommended decision that his findings, conclusions and result were based in controlling measure upon the

credibility evaluation which he made between the opposing witnesses in their irreconcilable testimony.

It should also be said that we are not here concerned with whether a credibility evaluation from opportunity to see and hear the conflicting witnesses testify would or would not result in a different recommended decision on the part of the examiner. Our inquiry is directed solely to the question of procedure, not result. And we do not reach any other question or contention which the parties have raised.

For the reasons indicated, the decision and order of the Commission are set aside and the cause is remanded for further proceedings.