508 A.2d 493

**CITIZENS FOR REWASTICO CREEK, et al.**

v.

**COMMISSIONERS OF HEBRON, et al.**

**No. 1030, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

May 12, 1986.

Timothy J. Lindon (Arnold & Porter, on brief), Washington, D.C., K. King Burnett (Webb, Burnett, Jackson, Cornbrooks & Wilber on brief), Salisbury, for appellants.

Marc K. Cohen, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee, Dept. of Health and Mental Hygiene.

John H. Thornton (Cullen, Clark, Insley & Hanson, on brief), Salisbury, for appellee, Commissioners of Hebron.

Argued before WILNER, BISHOP and GARRITY, JJ.

BISHOP, Judge.

Citizens for Rewastico Creek, a civic organization, and its individual members (Citizens) appeal the judgment of the Circuit Court for Wicomico County which affirmed the administrative decision of the Maryland Department of Health and Mental Hygiene (the Department) to issue to the town of Hebron a permit authorizing the discharge of treated sewage into the Rewastico Creek. Appellees are the Department and the Commissioners of Hebron (the Commissioners).[1] Appellants raise two issues:

I. Was evidence improperly excluded from the administrative proceedings?

II. Was the denial of a *de novo* or limited rehearing upon the withdrawal of the original hearing examiner proper?

## FACTS

In 1976, because of the widespread failure of private septic systems which posed a health threat to the community, the town of Hebron began the process of planning, funding and constructing a municipal sewage treatment facility. Studies of various alternatives were undertaken, federal and state funds were obtained, and, after public hearings, a Facilities Plan was approved by the Department and by the Federal Environmental Protection Agency (the

---

1. The cross-appeal of appellee Commissioners of the town of Hebron has been voluntarily dismissed.

E.P.A.). The selected alternative was a lagoon treatment plan with a discharge to Rewastico Creek (the Creek), a small tributary of the Nanticoke River and part of the greater Chesapeake Bay system.

After approval of the facilities plan and the obtention of funding, the next step was to obtain a discharge permit from the Department pursuant to Md. Health-Environmental Code Ann. § 9–324. After further studies, the Department issued a proposed discharge permit which contained specific guidelines. Pursuant to COMAR 08.05.06.01 *et seq.,* Citizens requested an adjudicatory hearing on the discharge permit. The Department appointed William O. Jensen as the Hearing Examiner. After ruling at a pre-hearing conference that design alternatives and the need for the system were not issues for the hearing, a five day hearing was held during which extensive evidence was presented.

After the hearing but prior to any proposed decision, Mr. Jensen resigned. Citizens requested an entirely new hearing. This request was denied; however, there was contained in the order denying the request a provision for the substitute hearing examiner to hear the testimony of specific witnesses, proposed by the parties, whose credibility was in question and to determine the issue or issues affected by that testimony. Based on the criterion set out in the order, both sides proposed that certain witnesses be heard. The newly appointed Examiner, Elizabeth M. Eckhardt, declined to hold a limited rehearing, stating that it would not be necessary in order to decide the matter. Subsequently, the Hearing Examiner issued proposed Findings of Fact, Conclusions of Law, and a Recommendation that the discharge permit be issued. After receiving written exceptions and hearing oral argument, the final decision-maker, Assistant Secretary for Environmental Programs, William M. Eichbaum, overruled Citizens' exceptions and adopted with some further elaboration the proposed Findings of Fact, Conclusions of Law and Recommendation of the Hearing Examiner as the final decision of the Department.

Citizens appealed to the Circuit Court for Wicomico County pursuant to Md.Ann.Code, art. 41, § 255 [2] and Rule B2. After accepting memoranda and hearing oral argument, the court issued a comprehensive opinion affirming the Department's decision to issue the discharge permit. Citizens then noted an appeal to this Court pursuant to Md. State Gov't Code Ann., § 10-216.

### I.

### *Introduction*

### A.

### *Standard of Review*

In this appeal we must apply the very limited standard of review applicable to the decisions of administrative agencies. Cognizance must be taken of the agency's expertise and the administrative decision therefore carries a presumption of correctness. In reviewing factual conclusions, this Court may not substitute its judgment for that of the agency. The administrative decision will not be disturbed on appeal if substantial evidence supports factual findings and no error of law exists. *See Juiliano v. Lion's Manor Nursing Home*, 62 Md.App. 145, 152–53, 488 A.2d 538 (1985); *Commission on Human Relations v. Washington Co. Commissioners*, 59 Md.App. 451, 455, 476 A.2d 222 *cert. denied*, 301 Md. 354, 483 A.2d 38 (1984); *Secretary v. Crowder*, 43 Md.App. 276, 280–82, 405 A.2d 279, *cert. denied*, 286 Md. 745 (1979).

### B.

### *Discharge Permits*

Obtaining a discharge permit is a necessary prerequisite to the discharging of any pollutants into waters of the

---

**2.** The Maryland Administrative Procedure Act has since been recodified in Md. State Gov't Code Ann. § 10–101 *et seq.* Former Md.Ann. Code, art. 41, § 255 is now set forth in Md. State Gov't Code Ann., § 10–215.

State. *See* Md. Health-Environmental Code Ann., § 9–323. The standards by which the Department may issue a discharge permit are set forth in Md. Health-Environmental Code Ann., § 9–324:

Issuance of discharge permit.

(a) *In general.*—Subject to the provisions of this section, the Department may issue a discharge permit if the Department finds that the discharge meets:

(1) All applicable State and federal water quality standards and effluent limitations; and

(2) All other requirements of this subtitle.

(b) *Information meeting and public hearing.*—Before issuing a discharge permit, the Department shall:

(1) In appropriate cases, hold an information meeting; and

(2) Provide an opportunity for a hearing on the subject.

(c) *Time and place of information meeting.*—The information meeting shall be held at least 15 days before the public hearing in the geographical area that will be affected if the discharge permit is issued.

(d) *Public notice of application.*—The Department shall give public notice of each application for a discharge permit by:

(1) Providing appropriate notice of the application for a discharge permit within 30 days after receipt of the application;

(2) At least 30 days before the public hearing, inserting an appropriate notice for at least 1 business day in a newspaper of general circulation in the county where the facility for which the permit is sought is located;

(3) Making available to the public appropriate documents, permit applications, supporting material, plans, and other relevant information; and

(4) Sending copies of the notice of public hearing to the units of local government, including sewer and water

agencies, that have jurisdiction over the area where the facility for which the permit is sought is located.

The statutes also grant to the Department authority to adopt regulations related to the issuance of discharge permits. Md. Health-Environmental Code Ann., § 9–325 (1985). Pursuant to such regulations, appellants initiated the adjudicatory hearing which is the subject of this appeal. *See* COMAR 08.05.06.[3] With this background in mind, we turn to the Citizens' contentions.

## II.

### *Evidentiary Issues*

#### A.

### *Facility Alternatives*

In the pretrial order, the Hearing Examiner ruled that design alternatives were not an issue in the adjudicatory hearing. Citizens does not attack this ruling directly, but rather they assert that the Hearing Examiner improperly excluded evidence of "cheaper and environmentally preferable alternatives to the proposed discharge." In the prehearing process, Citizens had proffered reports from engineering and environmental consultants which contained alternative approaches to treating Hebron's sewage. Appellees assert that the ruling of the Department which was affirmed by the circuit court is correct: that alternative treatment plans were not an issue at the discharge permit stage but rather were issues properly to be considered at the earlier facility planning stage.

Citizens rely on regulations issued by the Department which in relevant part provide:

---

**3.** COMAR 08.05.06 was originally adopted by the Department of Natural Resource and was transferred by Executive Order 01.01.1980.04, 1980 Md. Laws, Chap. 27 to the Department of Health and Mental Hygiene along with the substantive responsibility of pollution control regulation.

H. Criteria for the Issuance and Reissuance of State Discharge Permits.

(1) The Department of Health and Mental Hygiene shall issue or reissue a State discharge permit upon a determination that:

(a) The discharge or proposed discharge specified in the application is or will be in compliance with all applicable requirements of:

\* \* \* \* \* \*

(iv) Federal and State law or regulation.

\* \* \* \* \* \*

(c) If the discharge or proposed discharge is from publicly owned treatment facilities or other facilities, including privately owned sewage treatment systems, the discharge is in compliance with:

(i) The basin water quality management plan adopted pursuant to § 3–106 of the Natural Resources Article, Annotated Code of Maryland and the continuing planning process required under § 303(e) of the Federal Water Pollution Control Act Amendments of 1972, codified as Title 33, U.S.C.

COMAR 10.50.01.08H. Citizens contends that the federal law and the basin plan, with which the regulations require compliance in issuing a discharge permit, necessitate the consideration of alternative treatment plans.

Specifically, they cite language from the Federal Water Pollution Control Act, 33 U.S.C. 1281 *et seq.*, which provides:

(d) Waste treatment management construction of revenue producing facilities

The Administrator [of the E.P.A.] shall encourage waste treatment management which results in the construction of revenue producing facilities providing for—

(1) the recycling of potential sewage pollutants through the production of agriculture, silviculture, or aquaculture products, or any combination thereof;

\* \* \* \* \* \*

(3) the reclamation of wastewater;

Citizens further relies on the Nanticoke River Basin Plan which provides at page VI-10:

In applications where site conditions and economics allow, land disposal will be promoted by the State to ensure equal and adequate consideration with other alternatives. To implement this policy, all sewage *facilities planning studies* are required to fully consider all feasible land disposal techniques....

They also refer us to page III-22 of the same plan:

All *facilities plans* must fully consider all feasible land treatment methods as alternatives to surface discharge. It is the State policy to promote equal and adequate evaluation of land treatment alternatives.

(emphasis added).

■ The above provisions must be considered in the context of the several steps involved in the creation of a sewage treatment facility. The initial step involves demonstrating the need for a facility, obtaining funding, and obtaining State and Federal approval of the facility plan. *See generally* 40 C.F.R. 35.917 (1984); COMAR 10.17.80-09; Nanticoke River Basin Plan at III-12-23, 31-32. It is at this step that the above provisions require that various treatment alternatives be considered. The latter step of the process, at issue here, involves only the obtaining of a discharge permit from the State. As the Department and the Circuit Court concluded, the provisions Citizens rely upon do not require a reconsideration of treatment alternatives at the discharge permit stage. To find otherwise would alter the carefully constructed and already time-consuming administrative process. The clear intent of the regulatory scheme is that treatment alternatives be considered in the facility planning stages of the process.[4]

---

**4.** Appellants assert that a letter written by William Eichbaum, the final decision maker in the administrative process, after the final decision was rendered also supports their argument that other alternatives should have been considered. In the letter, Eichbaum indicates

Citizens' reliance on *Montgomery Environmental Coalition v. Costle*, 646 F.2d 568 (D.C.Cir.1980) is misplaced. *Costle* involved whether the Blue Plain Sewage Treatment Plant located on the Potomac River was in compliance with the already existing E.P.A. permit. The *Costle* Court ruled that, under the federal statute and standards there involved, evidence of treatment alternatives which would bring the plant into compliance with the previously issued permit was improperly excluded. *Costle* is factually and legally distinct from this case which involves a new facility seeking a discharge permit under Maryland law.

## B.

### *Need for Discharge*

Citizens' second evidentiary argument is that in ruling that they could not present evidence of issues involved in the State's "Anti-Degradation Policy," the Hearing Examiner improperly excluded evidence that the sewage treatment facility was not needed or justified. The "Anti-Degradation Policy" is set forth in COMAR 10.50.01.02E(1):

(1) Certain waters of this State possess an existing quality which is better than the water quality standards established for them. The quality of these waters shall be maintained unless:

(a) The Department determines a change is justifiable as a result of necessary economic or social development; and

(b) A change will not diminish uses made of, or presently possible, in these waters.

---

that while he felt legally compelled to overrule appellants' exceptions filed with him, he believed that alternatives to the proposed discharge merited further study and that he was withholding the sewerage construction permit pending further evaluation by the Town of available alternatives. This letter reflects our conclusion that the administrative process does not require consideration of the alternatives at the discharge permit stage, and goes on to recognize that the Department *may* consider such evidence if it so desires.

 Citizens assert that this provision required the Hearing Examiner to weigh the evidence of the amount of degradation versus the resulting social benefits. They do not tell us, however, the specific evidence that they sought to introduce. The single citation to the record extract is to a portion of the testimony of their expert witness, Harold Miller:

> [I]t is my opinion that the facilities plan did not have enough documentation given to it that there was a serious public health risk from the existing failing septic systems, and that the selected plan which is the purpose, or which is the plan resulting in this discharge permit, proposed—
>
> MR. COHEN: I object.
>
> THE WITNESS: —is not cost effective.
>
> MR. COHEN: I object. The witness has answered, anyway, over my objection, and I would simply ask the hearing officer to disregard the statement regarding the adequacy of the facilities plan and the determination that a sewer system is necessary since that is not the subject of this hearing.
>
> HEARING EXAMINER: Sustained.

The theory upon which appellants assert that the evidence should have been admitted, the anti-degradation policy, was not raised below in the portions of the record to which appellants have referred us and therefore the issue is not properly preserved. Rule 1085. Even if we were to reach the point, in the absence of a more specific proffer of what evidence would have been presented, we have nothing to review and therefore can find no error. *See Mack v. State*, 300 Md. 583, 603, 479 A.2d 1344 (1984); *Parrish v. State*, 64 Md.App. 663, 667, 498 A.2d 673 (1985); *Hartsock v. Strong*, 21 Md.App. 110, 120, 318 A.2d 237 (1974). Further, as noted earlier, the need for the treatment system is properly an issue for the earlier planning stages and not for the discharge permit hearing.

## III.

### *Substitute Examiner and Rehearing*

Citizens contends that the denial of its original request for a *de novo* hearing upon the withdrawal of the original hearing examiner and the substitute hearing examiner's decision not to conduct a limited rehearing of certain testimony effectively denies its right to a "live adjudicatory hearing before the finder of fact." Citizens asserts that certain witnesses' testimony was in conflict and that the "case turns on resolution of this conflicting testimony" and therefore the hearing examiner should have actually heard the testimony and seen the witnesses rather than merely reading the "cold record."

 The circuit court found no error in the administrative decisions which precluded any rehearing of testimony. We find the circuit court's detailed analysis of this issue to be correct and shall adopt as our own in the Appendix the pertinent portion of Judge Pollitt's opinion.[5]

JUDGMENT AFFIRMED; CROSS-APPEAL DISMISSED;

COSTS TO BE PAID BY APPELLANTS.

### APPENDIX

#### Memorandum Opinion

We begin by noting that:

The general rule in both the federal and state systems—although some states have decided otherwise, often on the particular unfairness of fact of the case being decided—is that in the absence of specific statutory direction to the contrary the deciding member or members of an administrative or quasi-judicial agency need not hear the witnesses testify.... The general rule is that it is

---

**5.** We have deleted some of the circuit court's discussion, as well as some case citations, footnotes and record citations. The remaining footnotes have been numbered consecutively.

enough if those who decide have considered and appraised the evidence and the courts feel more satisfied that they have done so if they have heard argument. *Younkin v. Boltz*, 241 Md. 339, 342, 343 [216 A.2d 714] (1966) (citations omitted).

It is the general practice in Maryland administrative procedure that an agency may "delegate its hearing authority to a hearing officer who shall conduct a hearing and shall submit written findings of fact and proposed conclusions of law to the agency head, official or employee." *Md.Ann.Code*, Art. 41, § 251A.[1] The Maryland Administrative Procedure Act (hereinafter called "APA") also provides that whenever, in a contested case, a majority of the officials who are to make the final decision have not heard the evidence, and the proposed decision is adverse to a party other than the agency, the agency must serve on the parties a copy of the proposed decision and grant the party an opportunity to file exceptions and present argument to the final decision maker(s). *Md.Ann.Code*, Art. 41, § 253.[2]

To this accepted practice, this case provides the court with a rare and, to Maryland, apparently a unique twist. The hearing examiner who heard all of the testimony of the witnesses was not the hearing examiner who filed the proposed finding of fact and conclusions of law. Neither party has cited nor has our research revealed a Maryland case on point. The applicable statute and regulation are silent on the issue of a hearing examiner being substituted by another who in turn recommends the decision but who did not actually hear the testimony.[3]

---

1. Currently, *Md. State Gov't. Code Ann.*, § 10–207, which also has "new language derived without substantive change...." Revisor's Note.

2. Currently, *Md.State Gov't.Code Ann.*, § 10–212.

3. *Md.Ann.Code*, Art. 41, § 251A, COMAR 08.05.06.13. Therefore, this case is distinguishable from *Howard County v. Bay Harvestore System*, 60 Md.App. 19 [478 A.2d 1172] (1984).

Therefore, we look to other jurisdictions for guidance. The pertinent provision of the Federal APA, 5 U.S.C.S., § 554, in part says:

> (d) The employee who presides at the reception of evidence pursuant to section 556 of this title ... shall make the recommended decision or initial decision required by section 557 of this title ... *unless he becomes unavailable to the agency....* (emphasis added)

Most of the federal cases on the issue have interpreted this section. The courts which have been confronted with a similar situation:

> ... do not agree as to whether the validity of an administrative decision is affected by a change in the person of a trial examiner, who does not make a final decision himself but submits only a report to the agency which makes the ultimate decision.
>
> In most of the cases the administrative decision has been held valid despite a change in the person of a trial examiner.

Annot., 18 A.L.R.2d 606, 615 (1951).

\* \* \*

*Gamble-Skogmo, Inc. v. Federal Trade Commission,* 211 F.2d 106 (8th Cir.1954), has been cited as the leading case on this issue. ... [T]he court there said, "A change in personnel occurring during the course of or at the close of an administrative hearing does not as such give rise to constitutional repugnance in a decision or order made by the administrative tribunal on the basis of the previous hearing." 211 F.2d at 112. However, the *Gamble-Skogmo* court examined the problem of substituting a hearing examiner in light of the purpose of the APA. It was found that the primary concern of Section 5(c) "was to proscribe a procedural guaranty" that recommended decisions would generally be made by the examiner who conducted the hearing.

> The object and the consequence of this guaranty would inherently be to make direct credibility evaluation by a

trial examiner constitute a processive element or factor in the arriving at of intermediate administrative findings, conclusions and decisions, submitted to an agency, in the functioning of the examiner system....

[T]he affording of the opportunity for such credibility evaluation and the according of the benefit to parties of this being done are fundamentally procedural grants and prescriptions and ... not substantive due-process requisites.

211 F.2d at 113. The court concluded that under Section 5(c) of the APA, the FTC had the right to refuse to strike the record and not require a *de novo* hearing in whole or in part before a substitute hearing examiner

only if it fairly could be said that a credibility evaluation from hearing and seeing the witnesses testify was unnecessary, in the sense that a direct choice in personal credibility as between them would not have to be made or would not from the nature of the situation be capable of being of material assistance, in the attempt of the substitute examiner to arrive at the controlling facts.

211 F.2d at 115. The Court held that as the credibility evaluation constituted a salient factor in the recommended decision of the substitute examiner, the decision and order of the FTC was set aside and remanded for further proceeding.

The U.S. District Court of the District of Maryland in *Van Teslaar v. Bender*, 365 F.Supp. 1007 (D.Md.1973), was confronted with the present issue when the hearing examiner felt he should be disqualified from the proceeding after the Coast Guard had presented its entire case. The court there cited most of the cases which have been cited to this Court by the parties in their memoranda and briefs as well as cases which our own research has disclosed. Cases subsequent to *Gamble-Skogmo* in several circuits have at least implied that substitution of an unavailable hearing examiner "would be improper under the APA without a *de novo* hearing in a situation on which credibility of the witnesses was an important factor in reaching a resolution

of factual disputes." [*Van Teslaar*] 365 F.Supp. at 1012. The courts which required a *de novo* hearing to be granted based their opinion on the improper resolution of credibility by one who did not hear the case. [*Id.*] The courts which allowed substitution of a hearing examiner without a *de novo* hearing did so because the demeanor or manner of the witnesses heard by the first examiner was not an important factor in determining credibility to resolve disputes of fact. [*Id.*] Upon review of the case law, the U.S. District Court of the District of Maryland in *Van Teslaar* concluded:

> [T]hat the APA allows substitution of examiners without a *de novo* proceeding only where the original examiner is unavailable and either (1) the case is not one in which the resolution of conflicting testimony requires a determination of the credibility of the witnesses or (2) if it is a case in which credibility is involved, the parties agree to proceed without a *de novo* administrative proceeding. 365 F.Supp. at 1012.

We recognize that the District Court's test is not binding on this Court. However, we shall use it as a guide to decide the appeal before us. First, we find that Chief Hearing Examiner Jensen was unavailable as he had resigned from the Department.

* * *

[T]he record clearly indicates that the parties did not agree to proceed without a *de novo* administrative proceeding. . . .

Therefore, in applying the *Van Teslaar* test, it must be determined whether this case is one "in which the resolution of conflicting testimony requires a determination of the credibility of the witnesses. . . ." Credibility is defined as, "worthiness of belief; that quality in a witness which renders his evidence worthy of belief." *Black's Law Dictionary* 330 (5th ed. 1979). The United States District Court for the Northern District of Ohio discussed the elements of credibility in the case of *In re Carr*, 436 F.Supp. 493, 495 (N.D.Ohio 1977):

In testing the credibility of the witnesses, the Court is required to consider the behavior of the witnesses upon the witness stand; their manner of testifying; the reasonableness and probability of their testimony; the opportunity they had to see, hear, and know the things about which they testified; the accuracy of their memory; their candor or lack of candor; their intelligence, interest and bias, if any; the relationship that each witness bears to either side of the case in chief; the extent to which, if at all, each witness is supported or contradicted by other evidence and all other tests of truthfulness which a Court is accustomed to apply in its daily administration to weigh and determine the value of each witness.

In response to the October 20, 1983 Order of Acting Chief Hearing Examiner Clark, the Commissioners of Hebron submitted a list of three witnesses whose credibility was questionable: Harold M. Miller, Jr., Edmund Burns, III, and Ralph Harcum. However, the Commissioners objected to any further testimony being heard. The Appellants submitted a list of five witnesses whose credibility "has been questioned": Miller, Stephen Luckman, Burns, Harcum and Omar Burton Owens, Jr.[4] In their Reply of Citizens of Rewastico Creek to the Commissioners of Hebron List of Witnesses Whose Credibility is Questioned, the Appellants stated that they did not believe any basis existed for attacking the credibility of those witnesses but rather listed the names because allegedly the OEP and the Commissioners had challenged their credibility in past hearing briefs.

\* \* \*

■ For purposes of evaluating credibility, we divide the witnesses into two groups, experts and laymen, as the case law recognizes two different criteria in the evaluation. "Though credibility of conflicting experts must play a central role in the [hearing examiner's] decision, that credibility is a function of logical analysis, credentials, data base, and

---

4. Luckman was called by the OEP and the other four were called by the Appellants. Luckman and Miller were expert witnesses.

other factors readily discernible to one who reads the record." *New England Coalition*, 582 F.2d at 100. Therefore, as between the conflicting testimony of Luckman and Miller, we find that the Assistant Secretary was correct in finding no error in Hearing Examiner Eckhardt's refusal to rehear their testimony.

The Assistant Secretary found that Hearing Examiner Eckhardt "had obviously decided that the credibility of the witnesses was either not crucial to the case or adequately demonstrated in the record." Final Decision at 8. The Appellants alleged that "the issues of credibility involved in this case concern the resolution of conflicting testimony (and not the issues of whether any individual witness was truthful)...."[5]

Harcum, Owens and Burns testified for the Appellants as to their personal observations of the Rewastico Creek area. Particularly, there was conflicting testimony among them regarding the effect of the wind on the tidal action in the Creek.* However, the Commissioners' complaint regarding the credibility of Burns and Harcum appears to result from their apparent collective conflict with Luckman's testimony.[6] During the November 21, 1983, hearing, Counsel for the Commissioners stated that Burns and Harcum were listed apparently only as a defense to a future claim of estoppel should he later raise any inconsistencies that might have existed. Nevertheless, the Commissioners contended that the inconsistencies and contradictions were evidence from the record. Counsel for the Department contended that the conflicts were "resolved, conceded, or recanted" on cross-examination and so there was no conflicting testimo-

---

5. *See, also,* Record (Hearing of November 21, 1983) at 20, 21.

* Since tidal action is caused by the sun and the moon and not by wind, we assume that by "tidal action" the court meant the "flow of water."

6. In the hearing before Hearing Examiner Eckhardt, Counsel for appellants Lindon said that Luckman and Owens were in agreement. However, Lindon questioned the reasoning in distinguishing Owens from Harcum and Burns.

ny. Further, he alluded to the conflict of the three lay-witnesses' testimony regarding the effect of wind on the tides. Our reading of Luckman's testimony is that the wind really had little or no effect on the tide ** in the Creek near the point of discharge. As to the high winds which the lay witnesses testified would stop or diminish tidal change, ** Luckman, while he recognized that winds would have some effect on the tide height range to vary, stated winds would positively affect re-airation, raising the dissolved oxygen (DO) level.

In reviewing the pertinent parts of the transcript of the five-day hearing, as well as the Proposal, it appears that the parties put more prominence on the credibility issue than did Hearing Examiner Eckhardt. The fact that there is conflicting testimony does not automatically require a determination of credibility. As in the situation of experts, credibility *per se* does not play a role in the resolution of their conflicting testimony. Rather, we look to whether the demeanor of the witnesses and their manner of testifying would constitute a "material factor" in reaching the proposed decision. *Gamble-Skogmo*, 211 F.2d at 114, 115.

The District Court in the case of *In re Carr* noted not less than ten elements in the testing of the credibility of witnesses. Only two of those—the behavior of the witnesses on the stand and their manner of testifying—are, in our opinion, elements available only to the hearing examiner who actually heard the testimony. The eight other elements were, of course, available to Hearing Examiner Eckhardt in determining issues of credibility, if any, from the record. The case law supports the view that it is the demeanor and manner of testifying that must be a material factor in reaching the decision.... After reviewing the testimony of the listed witnesses and the parties' Memoranda on the issue, we are not persuaded that the demeanor or manner of testifying was a material factor in the proposed

** *See* note (*), *supra.*

decision. We, therefore, find no error in the denial of a full or partial *de novo* hearing.