PEOPLE OF the STATE OF
CALIFORNIA, Appellant,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.

No. 81–2043.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 19, 1982.

Decided Sept. 17, 1982.

William D. Cunningham, Deputy Atty. Gen. of California, Sacramento, Cal., with whom George Deukmejian, Atty. Gen. and R. H. Connett, Asst. Atty. Gen. of California, Sacramento, Cal., were on the brief, for appellants.

Albert M. Ferlo, Jr., Attorney, Dept. of Justice with whom Edward J. Shawaker, Attorney, Dept. of Justice was on the brief, for appellees.

Before ROBB, Senior Circuit Judge; and BORK, Circuit Judge and JAMES F. GORDON,* Senior District Judge for the Western District of Kentucky.

Opinion for the Court filed by Senior District Judge JAMES F. GORDON.

JAMES F. GORDON, Senior District Judge:

In this appeal, the State of California challenges the Environmental Protection Agency's (hereinafter, EPA) deferral of funding for two advance waste treatment projects located in California. California applied to EPA for federal grants under the Clean Water Act, 33 U.S.C. § 1251 *et seq.,* to finance the two projects. EPA deferred funding pursuant to an EPA policy memorandum known as Program Requirements Memorandum 79–7[1] (hereinafter, Memorandum 79–7). California seeks a declaratory judgment that Memorandum 79–7 is invalid, an injunction against its use, and an order requiring EPA to apply certain other procedures to its review of advanced waste treatment projects in lieu of those created by Memorandum 79–7. In the District Court, the parties stipulated the facts material to the case, and the court awarded summary judgment to EPA. After a complete review of both the substantive and procedural grounds of California's attack of Memorandum 79–7, we agree with the District Court's conclusion that they are without merit. Therefore, we affirm.

The Clean Water Act creates, among other things, a federal grant program to aid municipalities in building sewage treatment facilities. *See,* 33 U.S.C. § 1281 *et seq.* During the 1980–81 fiscal year, California sought Clean Water Act grants to finance construction of two sewage treatment projects known as the "Las Virgenes Project" and the "Corona Project," respectively. Both the "Las Virgenes Project" and the "Corona Project" would provide a level of sewage treatment designated advance waste treatment by EPA. The term, "advance waste treatment," has a technical definition.[2] For purposes of this opinion, however, it is sufficient to note that EPA recognizes three relevant levels of waste treatment: secondary treatment, advance secondary treatment, and advance waste treatment. Secondary treatment is the minimum level of treatment permitted by the Clean Water Act for most publicly owned sewage treatment plants;[3] advance secondary treatment is a somewhat more stringent level of treatment; and, advance waste treatment is the most stringent level of sewage treatment recognized by EPA.[4]

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The entire text of Program Requirements Memorandum 79–7 is published at 44 Fed.Reg. 29,534 (May 21, 1979).

2. Memorandum 79-7 defines "advance waste treatment" to encompass "treatment levels providing for maximum monthly average BOD/SS less than 10 mg/1 and/or total nitrogen removal of greater than 50 percent. ('Total Nitrogen removal' = TKN plus nitrite + nitrate)." 44 Fed.Reg. 29,535 (May 21, 1979).

3. 33 U.S.C. § 1311(b)(1)(B) and (C). "Secondary treatment" is defined at 40 C.F.R. Part 133 (1981).

4. Memorandum 79–7 divides all sewage treatment projects that require treatment more stringent than secondary into two categories: "advance secondary treatment" and "advance waste treatment." "Advance waste treatment," abbreviated "AWT" in the memorandum, is defined in terms of technical water quality criteria, *see* note 2 *supra,* whereas "advance secondary treatment" is defined as "treatment more stringent than secondary but not to AWT levels ..." "Advance secondary

Memorandum 79–7 concerns EPA review of all Clean Water Act grant applications for advance secondary treatment and advance waste treatment projects.

Memorandum 79–7 is a policy memorandum which EPA issued to its regional Water Division Directors on March 9, 1979. The memorandum announced a new policy for the review of "Grant Funding of Projects Requiring Treatment More Stringent Than Secondary." In relevant part, the memorandum states:

> The Agency [EPA] will conduct a rigorous review of projects designed for treatment more stringent than secondary. The incremental additional capital costs of a project that are attributable to effluent limitations or water quality requirements more stringent than secondary must be based on a justification showing significant receiving water quality improvement and mitigation of public health problems where they exist. In addition, projects requiring treatment more stringent than secondary should be evalated [sic] for their financial impact upon the community. Also, the inflationary costs for delay should be considered in project reviews. The regions will review all such projects. They will decide how to proceed in accordance with this PRM [Program Requirements Memorandum] for projects having incremental costs beyond secondary of $1 million or less, and for other projects explicitly designated in this PRM for final regional decision. Headquarters review and decision on how to proceed will follow preliminary regional review for the remaining projects with incremental capital costs beyond secondary greater than $1 million.[5]

Thus, under Memorandum 79–7, the total cost of waste treatment "more stringent than secondary" must be justified by the

treatment" projects are not as closely scrutinized, under Memorandum 79–7, as are "advance waste treatment" projects. 44 Fed.Reg. 29,535 (May 21, 1979).

**5.** 44 Fed.Reg. 29,536 (May 21, 1979). The one million dollar threshold for "headquarters re-

improvement in public health and water quality it achieves before EPA will award Clean Water Act funds to finance the additional treatment.

Memorandum 79–7 is the product of congressional oversight of the Clean Water Act's grant program. Congress must yearly appropriate money from the federal treasury to fund the grant program. During its deliberations over EPA's 1979 budget, Congress became concerned about the cost effectiveness of funding sewage treatment more stringent than secondary. Despite the investment of billions of dollars in the Clean Water Act's grant program, two-thirds of all municipalities did not yet have sewage treatment plants that provided secondary sewage treatment. The House Appropriations Committee found persuasive a study, commissioned by EPA, known as the Vertac Report, which placed much of the blame for the lack of secondary treatment facilities on EPA's excessive funding of advanced waste treatment facilities. The committee observed:

> The [Vertac] report concludes that the ability of the States to establish excessive pollution control standards and have the Federal Government fund wastewater facilities required to meet these standards is questionable, at best. The effect is a large Federal subsidy to States that may be setting unrealistic requirements for pollution control which in turn result [sic] in expensive AWT [advance waste treatment] plants that may have little impact on water quality. A strong case can be made, especially with so much of the country lacking secondary treatment, that if States require AWT, its additional cost should be borne by the States and municipalities.

H.R.Rep.No.95–1255, 95th Cong., 2d Sess. 31 (1978). Subsequently, the Senate Appropriations Committee expressed "sympath(y)

view" had been raised to three million dollars by the time California filed its grant applications. However, the costs of the advance waste treatment aspects of each of the California projects exceeds three million dollars.

with the position of the House regarding EPA's failure to adequately monitor the use of grant funds for advanced wastewater treatment in the past." S.Rep.No.95–1060, 95th Cong., 2d Sess. 38 (1978). As a result, the House and Senate Conference Committee agreed that EPA could approve grants for facilities providing treatment greater than secondary only if the EPA Administrator personally determined that the advanced treatment "is required and will definitely result in significant water quality and public health improvements," or the total cost of the advanced treatment is one million dollars or less. H.R.Rep.No.95–1569, 95th Cong., 2d Sess. 8 (1978) (Conference Report). Memorandum 79–7 expressly states that its purpose is to fulfill the above congressional mandate, and the Appropriations Committees of both houses of Congress have repeatedly expressed their approval of the memorandum since it was issued.

As advanced waste treatment projects, both the "Las Virgenes Project" and the "Corona Project" fall within the scope of Memorandum 79–7. When EPA subjected the two projects to the "rigorous review" prescribed in the memorandum, the agency found that the additional costs of the advance waste treatment were not justified by the benefits which such treatment would achieve. Accordingly, EPA concluded that funding for the advance treatment aspects of the two projects should "be deferred unless and until further scientific studies and evidence support the need for these processes." In response to this EPA action, California challenges the validity of Memorandum 79–7.

California's substantive attack on Memorandum 79–7 focuses on the manner in which proposed waste treatment projects are selected for federal funding under the Clean Water Act. EPA, state governments, and local municipalities each play a role in this selection process. The Act gives EPA the authority to award grants for the construction of sewage treatment works which meet the requirements of the Act. 33 U.S.C. § 1281(g). It places primary responsibility for planning treatment plants

that satisfy the standards of the Act on the municipalities and other government entities that will own and operate the treatment plants. *Compare* 33 U.S.C. § 1281(g) *with* § 1283(a). The Act expressly gives the States, however, the responsibility for establishing priorities for federal funding among the various projects proposed by municipalities within the particular state. Section 216 of the Act, 33 U.S.C. § 1296, provides in relevant part:

> Notwithstanding any other provision of this chapter, *the determination of the priority* to be given each category of projects for construction of publicly owned treatment works within each State shall be made solely by that State, *except that if the Administrator, after a public hearing, determines that a specific project will not result in compliance with the enforceable requirements of this chapter,* such project shall be removed from the State's priority list and such State shall submit a revised priority list.

(Emphasis added). The essence of California's substantive argument in this Court is that Memorandum 79–7, as applied to the two California projects, usurps the role which Section 216 assigns California in the funding selection process.

California gave both the "Las Virgenes Project" and the "Corona Project" priority for federal funding in 1981. California acknowledges that the mere placement of these two projects on its 1980–81 Project Priority List does not entitle them to Clean Water Act grants. Nevertheless, it maintains that Section 216, quoted above, does require EPA to fund the projects unless the EPA Administrator determines, after a public hearing, that the projects do not meet the "enforceable requirements" to which Section 216 refers. In this case, EPA points to no "enforceable requirement" that the "Las Virgenes Project" and the "Corona Project" fail to satisfy, and EPA has held no public hearing to call into question the conformity of these two projects to the Act's "enforceable requirements." Since the two projects apparently conform to the "enforceable requirements," California ar-

gues, Memorandum 79–7 cannot justify EPA's deferral of funding.

■ We cannot accept California's argument. We do not believe Congress, through its committees, directed EPA to take action EPA has no statutory authority to accomplish. On the contrary, we believe EPA issued Memorandum 79–7 in fulfillment of a statutory duty. The full extent of EPA's authority to supervise federal grants under the Clean Water Act is not embodied in Section 216. The Clean Water Act makes EPA's authority to award grants to the States subject to numerous general goals and policies, as well as to the specific "enforceable requirements" to which Section 216 refers. Among these general policies is the requirement that EPA apply the Act's provisions so as to make the "best use of available manpower and funds." 33 U.S.C. § 1251(f). The purpose of Memorandum 79–7's rigorous review of advanced waste treatment projects is to insure that Clean Water Act funds are used in the manner which will achieve the most progress in water quality at the least cost. Such a policy is obviously designed to make the "best use of available manpower and funds." Thus, Memorandum 79–7 is clearly within EPA's statutory authority under the Clean Water Act.

■ California also attacks Memorandum 79–7 on procedural grounds. EPA issued Memorandum 79–7 without first giving interested parties notice of the memorandum and an opportunity to comment on its contents. California maintains that such "notice and comment" procedures are required by both the Administrative Procedure Act (hereinafter, APA), 5 U.S.C. § 500 *et seq.*, and EPA's own public participation regulations, 40 C.F.R. Part 25. Since such procedures were not followed, California argues Memorandum 79–7 is void. We do not believe, however, that either statute or regulations required EPA to follow "notice and comment" procedures before issuing Memorandum 79–7. The APA exempts from its "notice and comment" requirements all matters relating to federal grants. 5 U.S.C. § 553(a)(2). California argues that EPA

has waived this exception in regards to Memorandum 79–7 by promulgating public participation regulations, which require EPA to use "notice and comment" procedures before taking a variety of agency actions. *See* 40 C.F.R. § 25.2. Yet, when we examine these regulations we conclude that they also do not apply to Memorandum 79–7.

■ Memorandum 79–7 is a policy guidance memorandum. EPA's regulations make policy guidance memoranda subject to the regulations' "notice and comment" requirements only "when a Deputy Assistant Administrator determines it to be appropriate." 40 C.F.R. § 25.2(a)(4). No such determination was made in this case. California argues that Memorandum 79–7 is not a policy guidance memorandum, but rather EPA rulemaking, and therefore, within the scope of the "notice and comment" requirement of the regulations. *See* 40 C.F.R. § 25.2(a)(1). We cannot accept this characterization of the memorandum. Although EPA regulations do not specifically define "rulemaking" or "policy guidance memorandum," the meaning of the term "rulemaking" has been sufficiently explored in opinions of this Court to determine that Memorandum 79–7 does not fall within its scope. Generally, agencies engage in "rulemaking" when they "establish a standard of conduct which has the force of law." *Pacific Gas & Electric Co. v. Federal Power Comm'n.*, 506 F.2d 33, 38 (D.C.Cir.1974). Memorandum 79–7, however, imposes no new substantive requirements on obtaining federal grants for waste treatment projects. On the contrary, the memorandum merely informs the States and EPA's own regional offices that the agency will give advanced waste treatment projects a "hard look" to insure that EPA's funding of the particular project conforms with EPA's statutory mandate to make the "best use of available manpower and funds." Accordingly, Memorandum 79–7 is not a "rule".

In summary, our review of California's challenge to the validity of Program Requirements Memorandum 79–7 leads us to agree with the judgment of the District

Court. EPA's issuance of Memorandum 79–7, in response to congressional criticism, is well within the agency's statutory authority under the Clean Water Act. Furthermore, neither the Administrative Procedure Act nor EPA's own regulations required the agency to follow "notice and comment" procedures before issuing the memorandum. Thus, Memorandum 79–7 suffers from no procedural impairment. Accordingly, the District Court's award of summary judgment to the Environmental Protection Agency, and its denial of summary judgment to the People of the State of California is

*Affirmed.*