527 A.2d 772

**HOWARD COUNTY, Maryland, et al.**

v.

**DAVIDSONVILLE AREA CIVIC AND POTOMAC RIVER ASSOCIATIONS, INC., et al.**

No. 1355, Sept. Term, 1986.

Court of Special Appeals of Maryland.

July 8, 1987.

Certiorari Denied Dec. 9, 1987.

Marc K. Cohen, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Richard M. Hall, Asst. Atty. Gen., on brief), Baltimore, for Dept. of Health and Mental Hygiene.

Wilbur D. Preston, Jr., (Richard J. Magid, Whiteford, Taylor & Preston, Baltimore, Timothy E. Welsh, Acting Howard County Sol. and F. Todd Taylor, Ellicott City, on brief), for appellants.

William D. Johnston, III, Washington, D.C. (R. Graydon Ripley, Davidsonville, Diane D. Donahue, California, Daniel P. Sheridan and Rymer and Sheridan, Prince Frederick, on brief), for appellees.

Argued before WILNER, ROSALYN B. BELL and ROBERT M. BELL, JJ.

ROSALYN B. BELL, Judge.

This case arises out of a decision by the Department of Health and Mental Hygiene (Department), appellant, granting a discharge permit to Howard County (County), appellant, for a sewage treatment plant. The Little Patuxent Wastewater Treatment Plant (County Plant) discharges treated wastewaters, called effluent, into the Little Patuxent River. The Potomac River Association, Inc. and the Davidsonville Area Civic Association, Inc., appellees, are two voluntary associations located in St. Mary's County and Anne Arundel County, respectively.

The County applied to the Department to renew its discharge permit. Appellees, believing the permit would allow excess pollution into the waters, sought an adjudicatory hearing before the Department. At the conclusion of the adjudicatory hearing, the Department's hearing examiner issued a proposed decision finding that the permit met all applicable regulations and adequately protected water quality and concluding that the permit should be issued as proposed. After considering written exceptions and oral argument, the Department issued a Final Order approving the permit. Appellees appealed this decision to the Circuit

Court for Calvert County. The circuit court found the Department's decision was arbitrary and ordered the Department to modify substantially the terms of its permit. It also ordered the case remanded to the Department to consider new evidence. The Department and the County appeal presenting a number of questions:

—Was there substantial evidence to support the Department's findings that the permit adequately protected water quality?

—Did the trial judge err in concluding the Department's Final Order was arbitrary and thus substituting its judgment for that of the agency?

—Did the trial judge err in concluding the Department acted arbitrarily in prejudging the issue?

—Did the trial judge err when he remanded the decision to the Department to consider additional evidence?

—Did the trial judge err in ordering a modification of the permit?

Before we reach the merits of these issues, we need to set out the statutory and factual background of this case.

### The Regulatory Scheme

The Department was charged, *inter alia,* with managing, improving, controlling and conserving the waters of Maryland. A person may not discharge any pollutants into the waters of this State or operate any facility that discharges pollutants except as permitted by a State discharge permit issued by the Department. Md. Health-Envtl.Code Ann. §§ 9–322, 9–323 (1982). The Department is authorized to adopt rules and regulations that set effluent standards [1] for discharge permits and water quality limitations [2] to protect

---

**1.** Effluent standards specify the permissible levels of allowable wastes and the physical, thermal, chemical, biological and radioactive properties of allowable wastes. Md. Health-Envtl.Code Ann. § 9–314(b)(2) (1982).

**2.** Water quality standards set the maximum allowable short and long term concentrations of pollutants in the water, the permissible temp-

public health, recreation, industry and wildlife. Md. Health-Envtl.Code Ann. § 9–314 (1982). In adopting regulations, the Department is to consider, among other things, the character of the area involved, the nature of the receiving body of water, and the technical feasibility and the economic reasonableness of measuring or reducing the particular type of water pollution at issue. Md. Health-Envtl.Code Ann. § 9–313 (1982).

The Department may issue a discharge permit upon its determination that the terms of the permit meet all State and federal regulations, the water quality standards and the appropriate effluent limits. Md. Health-Envtl.Code Ann. § 9–324 (1982); COMAR 10.50.01.08H(1)(a). The Department's effluent standards must be at least as stringent as federal standards. Md. Health-Envtl.Code Ann. § 9–314(c) (1982).[3]

Publicly-owned treatment works, such as the County Plant, must meet the effluent standards of what is known as "secondary treatment."[4] COMAR 10.50.01.08J(3)(a). If the Department determines that the facility is discharging effluent into waters where secondary treatment is insufficient to maintain water quality, then "advanced waste treat-

erature range, and the minimum permissible level of dissolved oxygen in the water. Md. Health-Envtl.Code Ann. § 9–314(b)(1) (1982).

3. Federal and State law require that a person hold a federal National Pollutant Discharge Elimination System (NPDES) permit prior to discharging pollutants into any navigable waters of the United States. Federal Water Pollution Control Act, 33 U.S.C.S. §§ 1341(a), 1342 (1987). If the State program meets certain requirements, the United States Environmental Protection Agency (EPA) approves the program and suspends its own NPDES licensing program in that State. The EPA continues to receive copies of applications for NPDES permits and retains the power to veto State NPDES permits. *District of Columbia v. Schramm,* 631 F.2d 854, 857 (D.C.Cir.1980). The Department in the case *sub judice* issues Maryland discharge permits.

4. "Secondary treatment" means the treatment of sewage necessary to produce effluent of a set quality.

ment" is required.[5]  COMAR 10.50.01.08J(3)(b), (c), (d).  A plant discharge permit must also comply with the basin water quality management plan[6] and the approved county water and sewerage plan.[7]  COMAR 10.50.01.08H(1)(c)(i), (ii).

### The Patuxent River and Dissolved Oxygen

The Patuxent River, a tributary of the Chesapeake Bay, is over 110 miles in length and, on its way to the Bay, flows through portions of Prince George's, Howard, Anne Arundel, Calvert and St. Mary's Counties.[8]  The Little Patuxent River is one of two major tributaries flowing into the Patuxent.  Water quality studies have determined that the surge in the addition of nutrients, particularly nitrogen and phosphorus, has contributed to a deterioration of water quality in the Patuxent River by increasing the level of algae.

Algae are an important part of the food chain in the marine ecosystem.  The plants can also be responsible for depleting dissolved oxygen supplies in the water.  Dissolved oxygen is necessary to sustain aquatic wildlife, both flora and fauna.  During the time algae are living, the plants create dissolved oxygen through photosynthesis.  As the plants respire, they consume oxygen.  The chemical process

---

**5.** If the discharge is analyzed and the secondary limits are not sufficient to comply with other State water quality regulations, stricter limitations, or "advanced treatment," is then imposed.

**6.** The basin water quality management plan is adopted pursuant to Md.Nat.Res.Code Ann. § 3–106 (1973, 1983 Repl. Vol.).  The State is divided into service regions.  The management plan is a five-year plan for each service region which concerns the water supply, wastewater purification and solid waste disposal.

**7.** Under Md. Health-Envtl.Code Ann. Title 9, subtitle 5, the governing body of each county adopts and submits to the Department a county plan that concerns, *inter alia,* water supply, sewage and solid waste disposal.

**8.** One expert stated that the Patuxent is one of the most important sections of the Chesapeake Bay area in terms of biological productivity and ecological and recreational value.

involved in their decomposition results in the further con-
sumption of dissolved oxygen in the water. Thus, with
large quantities of algae dying, the result is a depletion of
the level of dissolved oxygen. This in turn reduces water
quality and threatens aquatic life. Nutrient control
management attempts to control the level of production of
the plants so as to maintain adequately the level of dis-
solved oxygen.

Algae require the same conditions to grow and proliferate
as all plants. These conditions include light, warmth, car-
bon, hydrogen, oxygen, and, most relevant here, the nu-
trients phosphorus and nitrogen. If any of these conditions
are less than optimum, their growth will be retarded. Nu-
trients may well be the only factor affecting algal growth
which feasibly can be controlled. Even nutrient control,
however, is difficult. This difficulty exists in part because
both phosphorus and nitrogen enter the Patuxent River
from both nonpoint sources, such as farm runoff, urban
storm water, groundwater inflow and the atmosphere,[9] and
from point sources, such as sewage treatment plants locat-
ed along the River.[10]

In the late 1970s, the State and the United States Envi-
ronmental Protection Agency (EPA) sought to determine
the extent to which nutrient control strategies would be
effective in controlling algal growth in the Patuxent River
and in turn improve water quality. One of the strategies
proposed was to reduce the level of phosphorous and nitro-
gen discharges from sewage treatment plants flowing into
the River. Quantifying the exact role discharged nutrients
play in algal growth is complicated and difficult. The
Patuxent Basin Area, which includes the Little Patuxent
River, is composed of both fresh-water segments, and salti-

---

9. Experts noted that seventy percent of the nitrogen contributing to
the Patuxent River comes from nonpoint sources.

10. Nine major sewage treatment plants, including the County Plant,
are located in the region known as the Patuxent Basin. There are
numerous minor plants located therein as well.

er, more estuarine, waters. The upper portion of the River area, where the County Plant is located, is fresh water. Scientists agree that the growth of algae in the freshwater portion can be controlled by reducing the nutrient phosphorus.

The lower portion of the River flows into the Chesapeake Bay and is saltier. The crucial question in the case at bar concerns the reduction of nitrogen or phosphorus and the resulting effect on algal growth in the lower, estuarine portion of the River. Quantification of the effect of these nutrients in this area is complex because of (1) the relative extent to which other factors, such as animal grazing and reduced sunlight, may affect algal growth; (2) the uncertainty of how upstream nutrients from both point and nonpoint sources affect this portion of the River downstream; (3) the effect of the intrusion of Chesapeake Bay water back into this section of the River; and (4) the relationship of bottom sediment and its demand for oxygen in this area.

The EPA, because of its responsibilities both to fund improvements through construction grants [11] and set permit limits, together with the Department, were interested in determining the benefit of advanced nutrient reduction technology in the Patuxent River. The Department and the EPA sponsored a study in this regard. The report, prepared by HydroQual, Inc., entitled "Water Quality Analysis of the Patuxent River," concluded that limiting the introduction of phosphorus from all major sewage treatment plants on the Patuxent River through advanced phosphorus removal would be the most effective means of controlling excessive algal growth in the River as a whole. The report was issued in August, 1981.

---

11. The EPA can only fund advanced wastewater treatment, such as phosphorus and nitrogen removal, when the treatment is "based on a justification showing significant receiving water quality improvement and mitigation of public health problems where they exist." *California v. United States Environmental Protection Agency,* 689 F.2d 217, 219 (D.C.Cir.1982).

In December, 1981, the Department sponsored a three-day meeting of environmentalists, scientists and other interested parties to examine the report and to determine the most appropriate nutrient control strategy for the Patuxent River. This meeting, referred to as the "charette," concluded with a recommendation that both phosphorus and nitrogen removal should be implemented in order to reduce the pollutant load down to the approximate level of what it was thought to have been in the late 1950s. The Washington Suburban Sanitary Commission (WSSC) volunteered to construct advanced nitrogen removal facilities at two of its treatment plants to help the Department and the EPA assess the cost and effect, if any, nitrogen removal would have in reducing algal growth in the River. The determination was made to record any nitrogen reductions achieved in the River pursuant to the WSSC's efforts before requiring advanced nitrogen removal for some or all sewage treatment plants along the Patuxent River.

The recommended strategy of advanced phosphorus removal was incorporated in the next Patuxent River basin plan.

### The County Plant

The County Plant was originally built by Howard County in 1965. Since the construction of the Plant, the County has received permits from the State to discharge effluent into the Little Patuxent River. It is uncontested that the County Plant is a clean, efficient facility. Effluent entering the Plant is biologically treated to remove large amounts of oxygen-demanding substances, suspended solids and other substances.[12] During this biological treatment, substantial

---

12. In simplistic terms, the 10–million gallons a day of wastewater coming into the Plant is processed through numerous stages as follows: Four hundred miles of pipeline drain into the treatment Plant. In the first stage, the wastewater flows through a pumping station to lift the flow into the treatment Plant. The screening operation then removes any debris or large objects that come through the system that could clog the Plant or damage the machinery. A grit removal

amounts of both nitrogen and phosphorus are also removed. In addition, an advanced waste treatment process further removes phosphorus to one part per million.[13]

Appellees have not challenged the ability of the County Plant to meet the terms of its previous discharge permits. Rather, they contend that the Department must require, through more restrictive limits in the discharge permit, that the County install advanced nitrogen removal[14] to remove

---

process is then employed to protect the equipment further. There is also a flow equalization system to balance out the tides of water coming into the system. Primary treatment begins next. Larger solids and some phosphorus and nitrogen removal occurs during this process. The secondary treatment then occurs. This is the process whereby the organisms and solids are broken down and a liquid by-product, effluent, is produced. The solid by-product, sludge, is removed at this stage. The solids processing facility collects the sludge, dewaters it and disposes of it. Filtration takes out the fine particles that are suspended in the effluent after the secondary treatment process. Chlorination and dechlorination occur to remove toxins harmful to fish and other biota. A post-aeration phase is available when additional dissolved oxygen needs to be pumped into the water.

The advanced treatment processes include a nitrification process, where ammonia is converted into nitrates and nitrites to protect the drinking supply and to discharge a less oxygen-demanding element into the water, and an advanced phosphorus removal process. The advanced phosphorous removal system is a sideline process. Approximately 20 to 30 percent of the flow from the main portion goes through this process where phosphorus is removed from the sludge and the treated sludge is reintroduced into the main system. The treated sludge acts like a vacuum to absorb phosphorus from the other sludge so the overall concentration of phosphorus is reduced. There is also a chemical treatment to remove even more phosphorus.

13. Approximately 700 pounds of phosphorus flow into the County Plant per day and roughly 37 pounds is ultimately discharged into the Little Patuxent River. With respect to nitrogen, 2400 pounds per day are taken in and 1367 pounds flow out through the general treatment of the wastewater.

14. Advanced nitrogen removal requires the addition of methanol to the nitrification process to convert the nitrates, nitrites and other nitrogen compounds back into ammonia. The ammonia is then bled off into the air and the air is then treated.

the remaining dissolved nitrogen in the Plant's effluent.[15] The Department and the EPA determined that advanced nitrogen removal was not justified.

## The Agency Action

On December 16, 1981, the County submitted an application to the Department to renew its permit. In accordance with Maryland law and regulations, and its review of the findings of the HydroQual report, the charette recommendations, the basin plan for the Patuxent River, and the County water and sewer plan, the Department prepared a proposed or draft permit that set effluent limitations. These limits included the federally-mandated effluent limits for publicly-owned treatment plants which require secondary treatment and, in addition, stricter limits to achieve advanced phosphorus treatment. The Department then solicited comments from the EPA, the U.S. Army Corps of Engineers and several State agencies on the proposed permit. It also prepared a fact sheet to be distributed to all interested parties and a notice of public hearing and opportunity to comment on the proposed permit.

Appellees, believing that the permit should also set specific limits for nitrogen, requested an adjudicatory hearing. At this hearing, appellees did not take issue with the determination that the proposed permit was adequate to meet all water quality requirements in the fresh water and the upper estuary portion of the River, but instead attempted to show that the remaining nitrogen in the Plant's effluent would have an adverse effect on water quality in

---

15. In 1975, the County applied through the Department for federal grant assistance to enlarge and upgrade its Plant from a secondary treatment plant to an advanced waste treatment plant. Initially, it was determined that the Plant should be designed for advanced nitrogen removal. After further study, the Department and the EPA determined that advanced phosphorus removal was preferable. The nitrogen removal design was abandoned and a phosphorus removal system was built and put into service in late 1981.

the lower estuary approximately 50 to 70 miles downstream from the Plant's discharge point.

At the conclusion of the adjudicatory hearing, the hearing examiner found that the evidence failed to establish that advanced nitrogen removal would, to any reasonable certainty, have a significant positive effect on water quality in the lower estuary area of the Patuxent River. Accordingly, the hearing examiner's proposed findings of fact and conclusions of law recommended issuance of the permit for the County Plant as proposed with advanced phosphorus removal only.

Appellees filed written exceptions and presented oral argument to the Department's final decision-maker, who ratified the proposed decision of the hearing examiner. Appellees then appealed to the Circuit Court for Calvert County challenging the Department's determination not to require advanced nitrogen removal at the County Plant through its discharge permit. The circuit court reversed and remanded the decision precipitating this appeal.

## I. MOTION TO STRIKE

Before we reach the substantive issues presented by this appeal, this Court must address appellant Howard County's Motion to Strike Appellees' Brief and to Prohibit Appellees from Participating in Oral Argument. Prior to argument, we granted that motion pursuant to Rule 1030 e.

On December 16, 1986, this Court sent a briefing schedule to all counsel. By stipulation of counsel, the time for filing appellants' briefs was extended to February 13, 1987. Appellants met that deadline. Counsel also stipulated that the time for filing appellees' brief was extended to March 23, 1987. Oral argument was set by this Court for April 20, 1987. Two days after the March 23 deadline, appellees served on appellants a motion for a further extension of time to file their briefs and to postpone the scheduled April 20th argument.

By a letter dated March 26, 1987, the Clerk of this Court notified all counsel that this Court had entered an order denying appellees' motion. Despite this order, on April 6, 1987—two weeks beyond the stipulated March 23, 1987 deadline—appellees filed a brief and appendix.

Rule 1030 sets out the time requirements for the filing of briefs. Rule 1030 a.2. provides that, within 30 days after an appellant's brief is filed, the appellee *shall* file copies of a printed brief. Rule 1030 a.3. permits the filing of a reply brief by the appellant in response to the appellee's brief by a certain time "but in no event later than ten days before the case is called for argument." Rule 1030 e. apprises the parties of the consequences of default:

> "When an appellant is in default under this Rule the case may be dismissed on motion or by this Court of its own motion; and when an appellee is in default, he *will not* be heard except upon consent of the appellant, or by request of Court." (Emphasis supplied.)

The Rule speaks in mandatory terms. If an appellee fails to file a brief timely, unless the appellant or this Court consents to hearing from the appellee, both by way of a brief and oral argument,[16] the appellee will not be permitted to argue its respective position.

In the case *sub judice,* appellees not only failed to file a brief within the extended time period, they filed it a substantial period of time after the deadline, and did so in the face of an order of this Court to the contrary. In their motion in opposition to the motion to strike, appellees never explained to this Court the reasons for their tardiness.[17] They only oppose the motion on the grounds that (1) appellants have not suffered irreparable injury and (2) that

---

**16.** The word "hear" implies not only auditory perception but any receipt of communication. Webster's Ninth New Collegiate Dictionary 559 (1983).

**17.** In their Motion for Extension of Time for Filing Answering Brief filed earlier with this Court, appellees asserted counsels' heavy workload and an equipment failure as grounds to support their request.

appellees should be, in essence, exempt from the time requirements because

"on one side, the forces of government [appellants] are accomodating [sic] principally land-based economic and population growth, where as, on the other side private persons and organizations [appellees] are representing declining water-based industry or not-for-profit interest groups seeking greater protection of the State's waters than Appellants would provide."

We are not persuaded.

Appellants and this Court have been prejudiced. Appellees' late filing reduced the time appellants had to file a reply brief to less than four days. Moreover, the work of this Court was delayed by at least two weeks. The pre-argument analysis by this Court was unnecessarily postponed and compressed by appellees' unilateral actions, and such postponement directly threatened this Court's understanding of this complex case. The time requirements not only ensure the orderly administration of justice, but allow this Court time to prepare thoroughly for the argument phase of an appeal.

We also reject appellees' claim that their tardiness is excusable because of their commendable efforts to protect the environment. Every litigant must be accorded the same degree of respect from this Court, regardless of the benevolent or self-interested position they espouse. Likewise, every litigant must accord the Rules and orders of this Court the highest degree of respect, regardless of the substance of their particular appeal.

Appellees' conduct in filing a brief two weeks beyond an already-extended schedule, particularly in the face of this Court's order, is plainly improper. They cannot ignore the needs of appellants and this Court and help themselves to a substantial extension, even after we, by specific order, have denied such extension. Their conduct flaunts the provisions of Rule 1030 and the order of this Court. Accordingly, we exercised our discretion and authority and granted appel-

lant Howard County's motion[18] to strike appellees' brief and deny oral argument. *See Podolski v. Sibley,* 12 Md. App. 642, 648 n. 6, 280 A.2d 294 (1971). We now turn to an examination of the substantive issues presented by appellants' appeal.

## II. SCOPE OF ADMINISTRATIVE REVIEW

This Court has recently and comprehensively reiterated the standard of review of agency action:

> "[A] very limited standard of review [is] applicable to the decisions of administrative agencies.... The administrative decision will not be disturbed on appeal if substantial evidence supports factual findings and no error of law exists."

*Citizens for Rewastico Creek v. Commissioners of Hebron,* 67 Md.App. 466, 470, 508 A.2d 493, *cert. denied,* 306 Md. 260, 513 A.2d 314 (1986). The Court of Appeals has stated the rule in another way:

> "We have made it quite clear that if the issue before the administrative body is 'fairly debatable', that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body...."

*Eger v. Stone,* 253 Md. 533, 542, 253 A.2d 372 (1969).

■ This narrow scope of review is imposed because "[c]ognizance must be taken of the agency expertise and the administrative decision therefore carries a presumption of correctness." *Citizens for Rewastico Creek,* 67 Md.App. at 470, 508 A.2d 493. A reviewing court is not permitted to

---

**18.** Appellees' suggestion that we strike only that portion of their brief and argument that dealt with appellant Howard County is without merit. Although appellant Department did not join in the motion to strike filed with this Court, the positions of both appellants are identical and appellees' tardiness and prejudice toward both appellants were identical.

substitute its judgment for that of the agency. *Citizens for Rewastico Creek*, 67 Md.App. at 470, 508 A.2d 493.

This Court in *Secretary of Health and Mental Hygiene v. Crowder*, 43 Md.App. 276, 281, 405 A.2d 279 (1979), further explained the rationale for this rule:

"State administrative 'agencies are created in order to perform activities which the Legislature deems desirable and necessary' to further the public health, safety, welfare, and morals.

\* \* \* \* \* \*

The powers vested in the courts, by statute or inherence, to review administrative decisions does not carry with it the right to substitute its fact finding process for that of an agency." (Citations omitted).

■ With these precepts in mind, the circuit court must review the record before the agency and decide whether there was substantial evidence before the agency, based on the record as a whole, to support the agency's conclusions and final order. *Peppin v. Woodside Delicatessen*, 67 Md.App. 39, 44–45, 506 A.2d 263 (1986). In the present appeal, the role of this Court is essentially to repeat the circuit court's review of the administrative record to determine whether the record as a whole reflects substantial evidence in support of the agency's conclusions. *Peppin*, 67 Md.App. at 45, 506 A.2d 263. This standard of review specifically applies to a final order of the Department issuing a discharge permit for a municipal wastewater treatment plant. *Citizens for Rewastico Creek*, 67 Md. App. at 470, 508 A.2d 493.

### III. SUBSTANTIAL EVIDENCE

■ It is clear that in concluding that the Final Order of the Department was arbitrary, the circuit court failed to follow the controlling law. Specifically, the court failed to consider whether the record as a whole supported the Department's decision not to require advanced nitrogen removal. This Court's review of the testimony presented

demonstrates there was substantial probative evidence presented before the Department to support the agency's decision. To substantiate this conclusion, we briefly set out the more pertinent evidence presented by appellants.

Stephen Luckman, a water resources engineer with the Water Management Administration's Permit Division within the State Office of Environmental Programs of the Department, testified that the EPA, as well as several State environmental departments, approved the permit without any negative comments. He stated that he prepared the draft permit after using a computer analysis tool, known as mathematical modelling, to analyze water quality effects of secondary treatment limits for discharges on the upper estuary. He determined that the permit discharges would not have any adverse effects on dissolved oxygen levels in the River as a whole, although he recognized, but dismissed as problematical and scientifically uncertain, the possibility that nitrogen discharges from the Plant would flow approximately 70 miles downstream to the lower estuary encouraging algal growth which in turn might reduce dissolved oxygen levels. He concluded by asserting that, in his opinion, it was unlikely that removal of nitrogen at the County Plant would have any significant beneficial effect on water quality. Luckman also testified that it is technically difficult to implement both nitrogen and phosphorus removal at the same time. He also opined that implementation of nitrogen removal at this stage of scientific research may be unnecessarily wasteful of resources and disruptive of more appropriate treatment processes at sewage treatment plants because of the infancy of nitrogen removal technology.

Arcadio Sincero, chief of the Water Management Administration's Permit Division and a chemical and environmental engineer, agreed with Luckman's conclusions. He explained that removing only phosphorus, and not nitrogen, was the most appropriate approach because certain species of algae, known as blue-green algae, have the ability to "fix" or pull nitrogen gas directly from the atmosphere.

Since nitrogen is the most prevalent element in the atmosphere, he opined that removing nitrogen would simply stimulate the growth of nitrogen-fixing algae. Sincero related that the blue-green algae are the least desirable form of algae, the most noxious to fish, and the most useless to the food chain.

Richard Sellars, Jr., Director of the Water Management Administration's Office of Environmental Programs, testified that, based on his understanding of the effects of nutrients on water quality, only phosphorus should be removed from the County Plant's discharged effluent. He believed that advanced nitrogen removal at the County Plant would have no measurable impact on the water quality of the lower estuary. He also related that there was still disagreement and uncertainty in the scientific community about the most effective control for algal growth in the Chesapeake Bay region. Sellars stated that if, after monitoring the effects in the lower estuary of WSSC's voluntary advanced nitrogen removal at its plants, the Department finds a scientific connection between advanced nitrogen removal and dissolved oxygen improvement, the Department would require the County Plant to construct facilities to comply with advanced nitrogen removal.[19]

Charles App, an official with the EPA and involved in water quality management planning for the federal agency, echoed the previous witnesses' opinions. He stated that in his professional opinion the most appropriate strategy for improving the Patuxent River was to remove phosphorus at all upstream sewage treatment plants because of the certain and beneficial effect of this strategy. App explained that in his opinion the best way to improve water quality in the lower estuary was to reduce the amount of algae which could flow downstream into the lower estuary by reducing phosphorus. He opined that advanced nitrogen removal should not be implemented until the effect of nitrogen from

---

**19.** In fact, the proposed permit requires the County to begin evaluating for the installation of an advanced nitrogen removal process.

upstream plants is shown to have a significant impact on the lower estuary. He stated that there was no scientific evidence that nitrogen discharged many miles upstream would have a measurable impact on the lower estuary because of the tendency of nitrogen after it entered the water to (1) return to the atmosphere as nitrogen gas; (2) become buried in the sediment; or (3) be taken up by fish, marshes and other organisms before reaching the lower estuary. Concurring with Sincero that a nitrogen-removal approach may foster the growth of blue-green algae, App further stated that this type of algae was found to have increased in the Potomac River when nitrogen was found to be the limiting nutrient.[20] App concluded that because the advantages of advanced nitrogen removal were so uncertain, the EPA could not provide grant assistance for constructing advanced nitrogen removal facilities.

Dr. Donald O'Conor, principal consultant for the firm of HydroQual, Inc. and a doctor of sanitary engineering, explained the methodology employed in formulating the HydroQual report and reiterated the conclusion that phosphorus rather than nitrogen should be removed. He rationalized as follows:

"Now, the reason why I am saying phosphorus rather than nitrogen, because I believe from what we know now that phosphorus will have a much greater impact than will the nitrogen. I know that if you put nitrogen [removal process] in, it probably would result in improvement. However, for the dollar spent, I believe the phosphorus removal will produce much greater, relevant improvement and might be sufficient to restore the environment to the state which it was previously...."

He agreed with Sincero and App that nitrogen removal may induce the growth of nitrogen-fixing bacteria, but stated it was unlikely.

---

**20.** A "limiting nutrient" is one that is most needed for plant growth but found in the least supply. Instead of reducing inputs of the nutrient in the greatest supply, nutrient management strategies attempt to reduce inputs of the least available limiting nutrient.

In response to the experts presented by appellants, appellees presented several expert witnesses who offered opinions contrary to those stated by appellants' witnesses. In particular, Dr. Christopher D'Elia, associate professor at Chesapeake Biological Laboratories of the University of Maryland, reported on the results of a controlled study he and two others conducted on the growth of algae after the *addition* of nitrogen and phosphorus into Patuxent River water. The results showed that under a controlled setting there was a ten-fold stimulation of algal growth during the warm period with the addition of nitrogen and a three-fold stimulation of algal growth due to the influx of phosphorus during the wintertime.[21] He concluded that, depending on the season, either nitrogen or phosphorus should be removed.[22] D'Elia admitted, however, that the added nutrient concentration did not represent likely nutrient levels in the estuary. He also conceded that the controlled tests did not take into account the effects of light and he was not certain about the transferability of the controlled results to the River as a whole. Moreover, D'Elia could not state with any degree of certainty or even conjecture that implementation of advanced nitrogen removal at the County Plant would significantly improve the level of dissolved oxygen in the lower estuary. Appellees' other experts testified similarly to D'Elia.

It is patent there was substantial evidence to support the agency's conclusion not to require advanced nitrogen removal at the County Plant. Both the State and the County presented credible witnesses and their testimony, together

---

21. D'Elia noted seasonal variations in the nutrient levels. During the high-flow season in late winter and early spring, nitrogen inputs and levels exceed phosphorus. During the low-flow season in late summer and early fall, the reverse occurred.

22. Dr. O'Conor took issue with D'Elia's conclusion because of the different perspectives of their studies. O'Conor used a mathematical modelling approach while D'Elia utilized a microcosm approach, or a field study. O'Conor focused on the effects of reducing nitrogen—the process at issue in this appeal—while D'Elia examined the effects of adding nitrogen to a segment of the Patuxent River.

with thousands of pages of supporting documentary evidence, was more than enough upon which "reasoning minds" could reasonably reach the conclusion set forth in the Department's Final Order. *See Peppin*, 67 Md.App. at 43, 506 A.2d 263. While there was disputed evidence and opinion expressed by appellees' expert witnesses at the adjudicatory hearing, the Department's Order presents a conclusion fully supported by the record. Accordingly, the circuit court clearly erred in concluding the Final Order was arbitrary.

## IV. SUBSTITUTION OF JUDGMENT

Appellants next assert the circuit court incorrectly substituted its judgment for that of the Department·by making its own qualitative evaluation of the evidence and testimony. We agree. We point to two examples to bear out this conclusion.

The circuit court found salient in its Opinion and Order that the Department had acknowledged it did not consider advanced nitrogen removal a viable option at the time because of the uncertain state of science in this regard. As the court concluded, "[t]he fact that the State was unsure of its position cannot provide the reason, or basis, for renewing the permit." The court mischaracterized the real import of the agency's action. The Final Order did not conclude, nor did the adjudicatory hearing evidence demonstrate, that the Department did not fully understand its position with respect to nutrient dynamics. The thrust of the testimony by all witnesses was that science itself is still debating the question of nutrient control in the lower estuary. Contrary to the circuit court's opinion, it was not uncertainty which provided the justification for the approval of the permit, but the logical determination that the decision to require advanced nitrogen removal must be based on reliable scientific evidence. The Final Order concluded that the evidence presented did not support such a requirement. Thus, from the court's statement, it is clear the court

simply chose to disagree with the agency's conclusion and evaluated the evidence as it saw fit.

As a second example of the court's ad hoc conclusions, the circuit court, citing Md. Health-Envtl.Code Ann. §§ 9–101(g), 9–302 and 9–314 (1982, 1986 Cum.Supp.), clearly believed that if nitrogen is even suspected of having any effect on downstream water quality, advanced nitrogen removal must be required:

"[The State's position not to require nitrogen removal] becomes even more specious where a state agency—duty bound to protect and safeguard water quality—is considering whether or not to approve the discharge of over ten million gallons per day of effluents that are even suspected of having a [causal] relationship to the problem at hand. The State has recognized the waters as being eutrophic/water quality limited,[23] has a duty to correct by, among other means, setting effluent standards, and has to treat all waste before discharge. Since nitrogen in certain forms is a waste now being discharged, it reasonably follows that nitrogen should be checked and monitored." (Transcript references omitted.)

This belief is not supported by law or reason.

Under Title 9 of the Health-Environmental Code, the Department is charged with supervising and controlling state waters and is required to develop comprehensive programs for the control of water pollution. Section 9–101(g) merely defines a pollutant.[24] Section 9–302 states the purpose behind subtitle 3, which is to establish programs and remedies to "prevent, abate, and control pollu-

---

**23.** Eutrophic waters are waters that are excessively enriched by the addition of nutrients which reduce water quality or bring on undesired ecological changes, such as excessive algal growth. COMAR 10.50.01.01B(22). Water quality limited waters exist where current discharge treatment is not sufficient to maintain applicable water quality standards, including the minimum required dissolved oxygen level. COMAR 10.50.01.01B(86).

**24.** Included in the definition of a "pollutant" is any waste or wastewater that is discharged from a publicly-owned treatment plant.

tion of the waters of this State." Section 9–314(a) provides that "[t]he Department *may* adopt rules and regulations that set, for the waters of this State, water quality standards and effluent standards." (Emphasis supplied.) There is nothing in these three statutory provisions which requires the Department at this time to set effluent limitations for nitrogen in the Patuxent River. In fact, § 9–314(a) specifically allows for the agency to decide against setting such a standard. The statutory analysis engaged in by the court demonstrates how the court substituted its own policy preference for that of the agency.

Not only do the pertinent statutes permit the Department to reject advance nitrogen removal, but sound economic policy dictates that decision as well. The Department, already staffed by experts in this area, went beyond its own staff and solicited advice from marine biologists, hydrodynamicists, water resource, chemical, environmental, civil and mechanical engineers, oceanographers, computer modellers, zoologists, chemists, and others. These interested parties noted that there is no absolute conclusion concerning the effect of upstream nitrogen discharges in the lower estuary. If we were to follow the court's reasoning, in spite of this scientific uncertainty, millions of dollars of local, State and possibly federal money would be allocated on the chance that an advanced nitrogen removal strategy might improve downstream water quality, while other, more certain, cleanup strategies could lay dormant for insufficient funding. Such insufficient cleanup funds could likewise threaten other polluted environments as well. It is for this reason that the Legislature grants the Department the discretion to set water quality standards and effluent limitations as it deems fit on the basis of the environment as well as the cost and feasibility of the particular cleanup strategy.

The laws of Maryland do not require effluent standards for every discharge, nor do they require the use of every control strategy to abate the evils of pollution. Not only do the statutes permit certain discharges, *see* Md. Health-

Envtl.Code Ann. §§ 9–322, 323 (1982), but, as we stated, the Department is mandated to consider the "technical feasibility" and "economic reasonableness of measuring or reducing the particular type of water pollution" before setting limits or standards for discharges. Md. Health-Envtl.Code Ann. § 9–313(b)(6), (7). The Department appropriately exercised its expertise and concluded there was insufficient evidence to support an advanced nitrogen removal approach. In light of this holding and the recognition that the issue of advanced nitrogen removal is, at the very least, fairly debatable, the circuit court was not empowered to substitute its judgment for that of the administrative body. *See Eger*, 253 Md. at 542, 253 A.2d 372.

■ We cannot leave this issue before noting that the circuit court also erred in recounting and relying on testimony not presented at the administrative hearing. The circuit court's order states:

"Apart from statutory requirements and definitions, the record evinces eloquent testimony by watermen's association counsel that 'it's somewhat horrifying to see the way that the shellfish industry and the watermen's industry has essentially ... died out. The oyster plants, *et, cetera*, are cobwebs of the past.' He added:

'It's a very sad state of affairs, the way the water industry has died there in Southern Maryland and what has gone about. I've seen it die. They have all the pictures of oyster boats harvesting oysters out of the Patuxent River where they were so thick that you could almost walk across the water on the boats. No longer the case. There are a lot of historical documents. No one cares about them anymore because they're meaningless.'

He further said that 'we have been treating phosphate for many years, and the river continues to die and die.' " (Transcript references omitted.)

The so-called "eloquent testimony" was actually argument by counsel on a motion to intervene before the agency

prior to the adjudicatory hearing. Counsel's argument in general has little to do with whether there is substantial evidence to support the agency's decision or whether the agency's decision is arbitrary; counsel's argument on a motion to intervene prior to the hearing has absolutely nothing to do with the evidence presented before the agency or the conclusion made by that body. The court erred in relying on these statements in deciding this case.

## V. PREJUDGMENT OF ISSUE

■ The circuit court also ruled that the Department's decision was arbitrary because the Department prejudged the issue prior to any administrative hearing:

"Compliance with Maryland Code Health and Environmental Article section 9–212 *et seq* does not re-countenance [sic] the fact that an interdepartmental decision was made on this permit long before these departments had heard opposing testimony thereto. We believe that the above scenario helped render the final order arbitrary."

Appellants assert the circuit court's belief was unfounded and, again, we agree with their argument.

The Code requires that State discharge permits comply with all federal water quality and effluent limitations. Md. Health-Envtl.Code Ann. § 9–314(c) (1982). The EPA retains the right to review all discharge permits issued by the Department. *See* n. 3, *supra*. The Department would have been remiss had it failed to consult with EPA and solicit the EPA's review and contribution into the discharge permit decision. Thus, merely because it drafted the proposed permit and submitted the proposal to the EPA does not amount to a predetermination on the issue prior to the adjudicatory hearing.

The circuit court also believed the issue had been prejudged because the Department published in the Maryland Register a notice of the terms and conditions it proposed to include in the permit. COMAR 10.50.01.08G mandates as

part of the notice and comment process that the Department provide interested parties with notice of its intended course of action and allows the interested parties an opportunity for a hearing to question the proposed permit. Those concerned determine whether they wish to testify or give written comments at a public hearing and whether they wish to avail themselves of a right to oppose the permit in an adjudicatory hearing. This procedural process is also required by federal law. *See* Procedures For Decisionmaking, 40 C.F.R. § 124.6–13 (1986). A conclusion that the permit decision was predetermined hardly flows from the fact that the Department followed the required procedures. In conclusion, the Department did no more than carry out its responsibilities in publishing the proposed permit and seeking review from the EPA.

Moreover, the record is barren of any evidence suggesting the hearing examiner, who conducted the adjudicatory hearing, and the Department's delegate, who rendered the final decision, prejudged the facts and predetermined the legal outcome. The decision to issue the permit was made only after full consideration by the agency.

## VI. CONSIDERATION OF NEW EVIDENCE

▪ After concluding that the Department's decision was arbitrary, the circuit court ordered that the case be remanded to the agency to consider new evidence submitted by appellees. The new evidence relied on by the court included a statement entitled "Nutrient Control in the Chesapeake Bay" issued by the Scientific and Technical Advisory Committee (STAC), STAC Ad-Hoc Working Group on Nutrients,[25] and two articles in the Environment Reporter published by The Bureau of National Affairs, Inc.[26] Appel-

---

**25.** The STAC report issued January, 1986, one and one-half years after the adjudicatory hearing before the Department, concluded that recent studies demonstrated nitrogen, as well as phosphorus, play vital roles in nutrient enrichment in the Chesapeake Bay Region, and that deteriorating water quality was directly correlated with increased

nutrient enrichment. The report also noted that advances in nutrient removal practices in other countries indicated that nitrogen removal was now a viable economic and technological strategy in nutrient control. The report determined that an initial strategy for water cleanup should focus on reducing nutrient inputs from wastewater treatment plants. The report concluded:

"As spokespersons for the research community, the Scientific and Technical Advisory Committee to the Chesapeake Bay Program, believes it is vital that the importance of nitrogen control be brought to the attention of the policy making and management segments of the Bay community for use in developing effective nutrient control strategies."

Appellants point out that, despite the report's conclusions, the report did not refute the fact that 70 percent of the nitrogen comes from nonpoint sources and that nitrogen is difficult to control at both point and nonpoint sources. According to appellants, the report also does not address the specific benefit advanced nitrogen removal at the County Plant will have on reducing algal growth and increasing dissolved oxygen levels in the lower estuary and is thus too general and unrelated to the particular circumstances in the instant matter to warrant agency consideration.

**26.** One article dated June 27, 1986 and entitled "Thomas Announces New Chesapeake Strategy, May Push Nitrogen Removal for Bay Clean-up," related that EPA Administrator Lee M. Thomas told the United States Senate Governmental Affairs Subcommittee on Governmental Efficiency and the District of Columbia before a hearing held June 24, 1986 that states situated on the Bay should adopt specific load limits for pollutants discharged into Chesapeake Bay tributaries. The article also related that the EPA was considering altering its policies on federally-funded municipal treatment plants to make nitrogen removal processes eligible for federal funding. The article then explains that "emerging data on the issue could make an informed decision possible within a year." That date would have been approximately June, 1987, long after the adjudicatory hearing in this case.

The article then credited Tudor T. Davies, director of the EPA's Office of Marine and Estuarine Protection, with stating that the EPA will look into the effectiveness of nitrogen removal from Europe, Japan and South Africa, but "[t]he agency is wary of applying such strategies on a broad basis without further data, because of the unique conditions of the bay and considerations of scale."

The second article, from the same source, dated July 11, 1986 and entitled "Maryland Plans Nitrogen Removal Projects: EPA Seeks Answers on Chesapeake Pollution," noted that Maryland plans to rebuild two municipal treatment plants, the West Branch and Parkway Treatment plants, to minimize nitrogen discharges. The article quoted Charles S. Spooner, liaison office director for the EPA's Chesapeake Bay Program: "Research also has yet to determine whether sewage treatment plants or agricultural runoff are the major sources of nitrogen loading in the bay," and added that decisions on this control strategy should be postponed until the EPA develops a computerized

lants now assert the court erred in remanding to the agency to consider the new evidence.

Maryland State Gov't Code Ann. § 10–215(e) (1984) authorizes a circuit court to remand to an agency to consider additional evidence if the evidence is shown to be material and good cause exists for why it was not presented at the time of the adjudicatory hearing before the agency. In the case *sub judice,* the court summarized the new evidence submitted by appellees,[27] and stated that "[appellees have] submitted new evidence which this court finds highly relevant; so much so that we will remand for its consideration." It is clear from the court's order that no findings were made as to whether the new evidence was material and whether good cause existed for its omission at the time of the hearing. Consequently, the court erred in remanding to the agency to consider this evidence under Md. State Gov't Code Ann. § 10–215(e) (1984).

■ Normally we would remand to the circuit court to make the predicate findings. Because of the procedural posture and timing of this case, however, we decline to order a remand. Let us explain.

If we assume that on remand the circuit court would find the proffered evidence was material[28] and good cause existed for its omission, then the circuit court would again remand the matter to the agency for an opportunity for the agency to modify its findings or decision. There is prece-

---

model to predict environmental effects of pollutant loads, including nutrients.

**27.** Appellees proffered additional evidence besides the STAC report and the two articles. The court only considered the above-mentioned evidence on the issue of remand under Md. State Gov't Code Ann. § 10–215(e) (1984).

**28.** It is highly unlikely that the two newsletter articles could be deemed material. It may be that any proffered testimony of the officials interviewed in the articles might be material, but the articles themselves reporting on facts gathered are most likely not material. *See Breedon v. Maryland State Dep't of Educ.,* 45 Md.App. 73, 83–85, 411 A.2d 1073 (1980).

dent, however, that even if an error of law has been discovered and a function remains to be performed by the agency, a remand to the agency while generally appropriate in such a case is not necessary if it would be futile. *Consumer Protection Div. Office of the Attorney General v. Consumer Publishing Co.,* 304 Md. 731, 748, 501 A.2d 48 (1985); *Hooper v. Mayor of Gaithersburg,* 270 Md. 628, 637–38, 313 A.2d 491 (1974); *Chevy Chase Village v. Montgomery County Council,* 258 Md. 27, 40, 264 A.2d 861 (1970). Recognizing that no error of law is involved but rather the performance of an administrative function, we think a remand in this instance would nevertheless be fruitless.

The permit at issue will expire December 31, 1987. By the time we remand to the circuit court to make the necessary findings and it then further remands to the agency, the remaining life of the permit at issue will be so miniscule that any modification in the decision the agency might make would be mooted shortly thereafter by the expiration of the permit. Moreover, in order for the County Plant to discharge effluent after the expiration date, that is to renew its permit, the County must apply to the Department for a new permit no later than 180 days prior to the date of expiration, or approximately July 4, 1987. Thus, before our mandate is even issued in this case, the Department more than likely will begin going through the entire renewal process, including public notice and comment. We have no reason to believe that during this renewal process, the findings and conclusions expressed in the STAC report will not be considered by the Department, nor do we believe the agency will not take into account any other relevant scientific data and technological developments with respect to advanced nitrogen removal. Since the renewal process coincides with our appellate review of the subject permit, it would be pointless for this Court to order a remand to the circuit court for further remand or referral to the agency to consider additional evidence that will be otherwise con-

sidered. Accordingly, we will not order a remand on the basis of the additional proffered evidence.[29]

## VII. MODIFICATION OF FINAL ORDER

■ Appellants finally allege the court erred when it substituted its own remedy for the Department's Final Order under the guise of "modifying" the Order. Under the Administrative Procedure Act, a circuit court reviewing an agency order is permitted to modify the order. Md. State Gov't Code Ann. § 10–215(g)(3) (1984). In this case, the circuit court exceeded its statutory authority.

The court, on the basis of its conclusion that the Department's decision was arbitrary, entered an order stating that the subject discharge permit "is modified to prohibit any increased discharge of nitrogen...." The circuit court's order, in effect, did not modify the Department's order, but instead replaced it by requiring, in effect, implementation of a nitrogen removal system.

In *Consumer Publishing Company*, 304 Md. at 747, 501 A.2d 48, the Court of Appeals considered and rejected the position that the authority to modify under the Act included the power to replace the agency's order with an entirely distinct one. The circuit court in the case *sub judice* attempted to do exactly that.

Moreover, quoting *O'Donnell v. Bassler*, 289 Md. 501, 509, 425 A.2d 1003 (1981), the Court in *Consumer Publishing Company*, 304 Md. at 748, 501 A.2d 48, stated:

" '[I]f an administrative function remains to be performed after a reviewing court has determined that an administrative agency has made an error of law, the court ordinarily may not modify the agency order. Under such

---

**29.** Lest this result seems unduly harsh, if it later becomes apparent that advanced nitrogen removal is required, the Department's rules permit suspension or modification of a permit at any time during the five-year life of a discharge permit if sufficient cause is shown. COMAR 10.50.01.12C., F., G.

circumstances, the court should remand the matter to the administrative agency without modification.' "

In the case *sub judice*, in light of the court's findings that the agency should hear and consider additional evidence, the circuit court patently erred in even attempting to "modify" the Order. It could only have remanded the case based on those findings. The order by the court prohibiting any increased nitrogen discharge exceeded the court's statutory authority.

In conclusion, there was substantial evidence presented before the Department to support the agency's finding that the permit should be issued and the agency's conclusion was not arbitrary. The circuit court erred in reversing, remanding and substituting its own order for the Department's Final Order.

The aquatic ecosystem, like a well-rehearsed symphony, requires a delicate balance of elements to maintain its high quality. The Patuxent River Basin now reflects man's negative impact on those elements, and scientists, government officials and others concerned are working diligently to restore the health of the Chesapeake Bay and its tributaries. Opinion is discordant on the optimum strategy to achieve this goal. The Department charged with protecting the waters of this State has decided the issue with respect to nutrient control for the County Plant. That determination was based on substantial competent evidence and was not arbitrary in any manner. The circuit court had no right to usurp that decision with its own strategy for water cleanup. No matter how admirable the circuit court's intentions may have been, those intentions must, in this instance, give way to the law and the advances of science.

JUDGMENT REVERSED.

CASE REMANDED TO THE CIRCUIT COURT TO AFFIRM THE JUDGMENT OF THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE.

COSTS TO BE PAID BY APPELLEES.